**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

SLIDELL, INC.,

Plaintiff and Counter-defendant,

v.

MILLENNIUM INORGANIC CHEMICALS, INC.,

Defendant and Counter-claimant.

Civil No. 02-213 (JRT/FLN)

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT/COUNTERCLAIMANT'S MOTION FOR A PRELIMINARY INJUNCTION**

---

Jeffrey W. Post and Thomas S. Fraser, FREDRIKSON & BYRON, P.A., 1100 International Centre, 900 Second Avenue South, Minneapolis, MN, 55402-3397, for plaintiff and counter-defendant.

Scott A. Smith, Michael T. Nilan and Matthew E. Johnson, HALLELAND LEWIS NILAN SIPKINS & JOHNSON, 220 South Sixth Street, Suite 600, Minneapolis, MN, 55402, for defendant and counterclaimant.

This matter is before the Court on the motion of defendant and counterclaimant Millennium Inorganic Chemicals, Inc. ("Millennium") for a preliminary injunction. Millennium seeks an order from the Court that would temporarily enjoin plaintiff Slidell, Inc. ("Slidell") from disassembling partially-constructed packaging equipment designed for Millennium under an $11 million contract until a full determination of the claims asserted in this action can be made. For the reasons that follow, the Court grants the motion.

APR 17 2002
FILED ______
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. ______
DEPUTY CLERK ______

## BACKGROUND

Millennium is a large manufacturer of a variety of inorganic products, including titanium dioxide ("$TiO_2$") pigments.[1] Slidell is a manufacturing company located in Owatonna, Minnesota. It manufactures automated industrial packaging equipment systems used by a variety of $TiO_2$ manufacturers like Millennium and other manufacturers who supply products to customers in powdered form.

In the late 1990s, Millennium embarked on a $38 million improvement project encompassing its $TiO_2$ manufacturing plants in Ashtabula, Ohio, Le Havre, France and Stallingborough, United Kingdom. The project called for, among other things, improving and/or expanding $TiO_2$ packaging performance in all three facilities. In December 1999, Millennium and Slidell executed a Letter of Intent ("LOI") by which Slidell stated its intent to design and manufacture, and Millennium its intent to purchase, a number of fully automated packaging machines for Millennium's use in its three plants. After the execution of the LOI, Slidell and Millennium continued negotiations to firm up the specifications for the machines and the details of the contract.

In April 2000, Millennium and Slidell executed a written contract dated March 17, 2000. Under the contract, Slidell agreed to design, manufacture, deliver and install seven packaging machines for Millennium—three each for its plant in the United Kingdom and Ohio and one for its plant in France. The contract price for all seven packaging machines was $10,350,465, to be paid by Millennium according to a milestone-based payment

[1] $TiO_2$ is a white, non-toxic pigment used to impart opacity and whiteness in paint, plastics, paper and other products. It is manufactured in powdered form and is shipped to customers in either a wet slurry or in its dry powder state.

schedule outlined in the contract. Contract ¶ 20. The contract also incorporated a 12% discount provision premised upon the manufacture of "identical" units of packing equipment. Contract ¶ 20(b). According to other terms of the contract relevant to the dispute, the parties agreed that "title to the Goods shall remain with Slidell until the full purchase price (including installation and service costs) is paid." Contract ¶ 3. The parties also agreed that modifications to the contract could be effectuated through the execution of change orders. Section 19 provides that "Change Orders may be requested at any time by [Millennium] or [Slidell] to alter, add to, delete aspects of, or otherwise change the final scope of the project." Contract ¶ 19. The parties further agreed that should "the parties elect to proceed with such Change Order, a Change Order shall be executed by both parties and [Slidell] shall proceed with adjustments to the Project Schedule, the final scope of the project, the Contract Price or other aspects of the final scope of the project as defined in such Change Order." *Id.* Finally, the parties confirmed that "[t]his Contract, including all of its exhibits, appendixes and attachments, comprises the entire agreement between [Millennium] and [Slidell]." Contract ¶ 22.

Work on the project progressed slowly, in part because of difficulties that arose concerning two critical areas of production—wire color-coding and the supervisory control systems. In the summer of 2000, it was brought to Millennium's attention that the wire colors specified in the contract did not fully comply with all applicable US, UK and European standards. To resolve this issue, the parties agreed to Change Order No. 3, which set forth revised wiring colors with no change to the contract price. However, a few months later, the parties returned to the original specifications concerning wire color

and added $7,600 to the contract price to compensate Slidell for the extra expense incurred as a result of the changes. Change Order No. 4.

Difficulties also arose with respect to the equipment's supervisory control system, which is a computer software interface between the packaging units and other $TiO_2$ production components. Millennium claims this issue was also resolved through the execution of a change order in which the parties agreed to remove the supervisory system from the scope of Slidell's work but without any change in the contract price in recognition of the work performed by Slidell on this issue. Slidell says it has not signed Change Order No. 5 effectuating these changes. Slidell also claims, among other things, that any blame for delays under the contract lies with Millennium as a result of its interference with Slidell's production of the equipment and the ineffective management team Millennium employed on the project.[2]

In September 2001, Slidell demanded that the 12% discount built into the contract for the manufacture of identical equipment be eliminated from the contract price. Millennium rejected this request, contending that, despite the execution of several change orders, none of the agreed-upon modifications differentiated the machines from one

---

[2] Slidell also claims that Millennium breached an oral agreement for Slidell's establishment of Slidell B.V., a European servicing facility in Belgium. According to Slidell, it expended time and expense opening, staffing and maintaining a European office based on Millennium's representations that it would need Slidell's long-term support services for its Europeans plants. However, these allegations fall outside the terms of the March 17, 2000 contract and therefore run afoul of the integration clauses expressly included in the contract. Contract ¶ 1 (providing that "all other provisions of any previous order or communication that are additional or different from the terms hereof are expressly rejected") *id.* ¶ 22 (reiterating that "this contract, including all of its exhibits, appendixes and attachments, comprises the entire agreement between Owner and Contractor"). Slidell is entitled to prove that a separate European servicing agreement existed between the parties and was breached, but that issue is irrelevant to the issue of whether Slidell breached this contract.

another to render the discount provision inapplicable. Thereafter, Slidell discontinued work on the units and no progress has been made since November 2001. Currently, the partially-constructed equipment sits on Slidell's production floor in various stages of assembly.

To date, Millennium has paid Slidell a total of $8,580,734.20 in progress payments under the contract; the total contract price currently stands at $11,058,475.76, inclusive of the change orders. In other words, Millennium has paid 77.6% of the total contract price. By contrast, according to the current state of construction of the units and the payment schedule in paragraph 20 of the contract, Millennium estimates that Slidell has earned no more than 65% of the total contract price, meaning that Millennium has paid Slidell at least $1.4 million more than what Slidell is currently entitled under the contract. Nonetheless, Slidell has stated that it cannot complete the machines without a substantial infusion of more capital.

Slidell commenced this action in January 2002, contending that Millenium was in breach of contract for, among other things, interfering with and unjustifiably hindering Slidell's performance of its contractual obligations; failing to fulfill its contractual obligations in a diligent manner; interfering with Slidell's production resources; making numerous requests for Slidell's performance of work outside the scope of the contract; making numerous misrepresentations in breach of the confidentiality agreement executed as part of the contract; making unwarranted and extensive requests for changes to the scope of the contract; failing to make payments in a timely manner and refusing to follow through with its commitment to utilize Slidell B.V.

Shortly thereafter, counsel for Slidell informed Millennium by letter dated February 19, 2002, that it was contemplating disassembling the seven packaging units for purposes of selling off the parts for value:

> If this matter is not resolved shortly, Slidell may soon be forced to disassemble the packaging equipment it was building for Millennium to use components or to place it in storage to mitigate damages.

Scott A. Smith Aff. Exh A. Millennium strenuously objected to any disassembly of the packaging equipment, however, on March 4, 2002, Slidell reiterated and expanded upon its intention to dispose of the equipment designed for Millennium under the contract:

> Slidell intends to mitigate its damages by using components of the packaging equipment for other orders or otherwise dispose of the equipment after Millennium's inspection. Slidell has a significant amount of overhead taken up not only by the floor space the equipment occupies, but also by the value of the equipment's parts. Slidell can only mitigate its overhead losses, which it estimates at in excess of $500,000/month if it uses the components of the equipment. If Slidell does not, it puts its very existence at risk.

Smith Aff. Exh. C. Based on this correspondence, Millennium counterclaimed and moved for injunctive relief to preserve the status quo and maintain the machines and parts designated for the project until a full determination on the merits can be made.

## ANALYSIS

### I. Jurisdiction

Before addressing the merits of Millennium's motion for a preliminary injunction, the Court must address the threshold question raised by Slidell concerning the Court's jurisdiction to grant the injunctive relief Millennium seeks in this motion. Slidell contends that under *Grupo Mexicano de Desarrollo v. Alliance Bond Fund Inc.*, 527 U.S. 308 (1999), the Court is without jurisdiction to enter a preliminary injunction. In *Grupo*

*Mexicano,* the Supreme Court held that "the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." *Id.* at 333.

*Grupo Mexicano* is distinguishable from the case at bar because in *Grupo*, the plaintiffs sought only money damages on its contract claim.[3] In this case, by contrast, Millennium's counterclaim also seeks equitable relief in the form of a constructive trust, equitable lien, specific performance and/or replevin. Accordingly, the holding in *Grupo* does not deprive the Court of jurisdiction to entertain Millennium's claim for equitable relief. *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940) (injunction freezing assets permissible where complaint stated cause of action for equitable relief); *United States ex rel. Rahman v. Oncology Assocs. P.C.*, 198 F.3d 489, 494-98 (4th Cir. 1999) (interpreting *Grupo* holding to be limited to claims for money damages only and concluding that complaint which asserts claims for money damages and equitable relief "does not defeat the district court's equitable powers").

## II. Dataphase Factors

In the Eighth Circuit, a preliminary injunction may be granted only if the moving party can demonstrate: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; 3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.

[3] The very first sentence of the opinion makes this clear: "The case presents the question whether, in an action for money damages, a United States District Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed." *Id.* at 310.

1981). "No single factor in itself is dispositive; in each case all the factors must be considered to determine whether on balance they weigh towards granting an injunction." *Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987); *Dataphase*, 640 F.2d at 113 ("In balancing the equities no single factor is determinative."). However, a court may not issue a preliminary injunction without finding that some possibility of irreparable harm to the movant exists. *Id.* at 114 n.9.

**1. Irreparable Harm**

Millennium has made a convincing showing of irreparable harm. To date, Millennium has paid over $8.5 million on an $11 million contract for machines that are only partially completed and for which Millennium has not yet received anything in return. In letters from counsel for Slidell to Millennium shortly after Slidell filed this action, Slidell has stated that it intends to disassemble the units in their currently partially-assembled state and sell the parts to third parties. Should Slidell carry out this threat, Millennium's request for equitable remedies of specific performance, replevin, constructive trust and equitable lien will be rendered meaningless. All these claims depend upon the continued existence of the equipment.

Although Millennium has also asserted a claim for money damages for Slidell's alleged breach of contract, Millennium has made a sufficient showing that Slidell's current financial situation renders it questionable whether it could satisfy a money judgment against it. Slidell's tenuous financial circumstance is evident given its claim that it needs to disassemble the currently constructed units and sell the parts in order to remain in business. The Eighth Circuit has held that the threat of unrecoverable

economic loss due to a company's bankruptcy or insolvency can constitute irreparable harm. *Iowa Utilities Board v. Federal Communications Comm'n*, 109 F.3d 418, 425-26 (8th Cir. 1996); *Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1227 (8th Cir. 1987) (upholding district court's issuance of a preliminary injunction where movant "demonstrated a clear probability that defendants will not be able to satisfy an award of adequate damages").

Moreover, as Millennium emphasizes, monetary relief is of secondary importance to Millennium in this case. Millennium is keenly interested in obtaining the machines currently sitting on Slidell's production floor. It has expended substantial capital reconfiguring its plants for this particular equipment and by Slidell's own admission, "[t]he Packaging Equipment is engineered to meet Millennium's specific technical needs." Complaint ¶ 11. On these facts, the Court finds that Millennium has made a strong showing that, absent an injunction, the possibility of irreparable harm to Millennium clearly exists.

### 2. Balance of Harms

The balance of harms also weighs in favor of Millennium. Absent an injunction, the harm to Millennium is obvious: were Slidell to dismantle the equipment and sell the parts to third parties, not only would Slidell be unjustly enriched, but Millennium would be at serious risk of losing all of the $8.5 million it has paid Slidell, as well as the extensive investment it has made reconfiguring its plants in preparation for this specialized equipment.

For its part, Slidell claims the imposition of an injunction would jeopardize its future by crippling its cash flow, would consume half of its production floor and cost it over $500,000 a month in overhead costs. While the Court sympathizes with the financial difficulties Slidell is experiencing at the moment, the Court is not persuaded by several of Slidell's arguments. For instance, Slidell claims that it can alleviate its financial problems by doing other projects because the other projects have milestone-based progress payments. However, this project is structured precisely the same way. Contract ¶ 20(a). Slidell could earn its final $ 2.5 million on the contract and free up its production floor were it to complete the equipment.[4]

Furthermore, to the extent Slidell is prevented from taking on new projects because Millennium's units are occupying its production floor, Slidell can minimize such harm by placing the partially-constructed packaging units in storage during the pendency of this litigation. Indeed, Millennium has stated that it is not opposed to such an arrangement upon mutually-agreeable terms and conditions. Accordingly, when the harms asserted by each side are balanced against one another, the Court finds that the risk of harm to Millennium absent an injunction is decidedly greater than the harm to Slidell should an injunction be issued.

[4] Slidell has claimed damages of $30 million, however, a review of the contract plainly reveals that damages are limited to the contract price. Contract ¶ 4 ("[Slidell] further agrees in no event shall [Millennium] have liability for direct damages in excess of the contract price of the portion of the goods or services in respect to which a claim is made, whether such claim arises out of contract, negligence or other tort or otherwise."). Accordingly, the most Slidell could recover from Millennium for breach of the March 17, 2000 contract is the difference between the current contract price and the amount Millennium has already paid.

### 3. Probability of Success on the Merits

The Eighth Circuit has emphasized that "[t]he very nature of the inquiry on petition for preliminary relief militates against a wooden application of the probability test." *Dataphase*, 640 F.2d at 113. Indeed, the circuit has expressly rejected the argument that in every case, "the party seeking preliminary relief prove a greater than fifty percent likelihood that he will prevail on the merits." *Id.* Rather, "the equitable nature of the proceeding mandates that the court's approach be flexible enough to encompass the particular circumstances of each case." *Id.* Where a movant makes a strong showing on other factors, as Millennium has done here, the showing of success need not be as strong. *Id.* at 113 (explaining that the showing of success on the merits can be less when the equities are otherwise strongly in his favor).

In this case, both parties have asserted breach of contract claims against the other and the facts concerning the parties' conduct during performance of the contract are very much in dispute. Nonetheless, at this stage, albeit a preliminary one, Millennium appears to have the stronger claim. The undisputed facts establish that Millennium has paid nearly 80% of the contract price for seven packaging units which are not yet complete and are now in jeopardy of being dismantled. Although Slidell claims that delays were caused because of issues that arose regarding critical path items, the parties specifically agreed under the contract that modifications of the contract could be requested and sought by either party and resolved through the execution of change orders. That is precisely the process that occurred here. Additionally, Slidell's demand to eliminate the 12% discount seems questionable given that the change orders applied equally to all the units. Accordingly, this factor weighs in favor of Millennium.

**4. Public Interest**

Finally, the public interest in the performance of contracts weighs in favor of issuance of an injunction, particularly where, as here, Millennium has made substantial advance payments of money in return for a seller's promise of future delivery.

Having found that all four *Dataphase* factors weigh in favor of granting the requested preliminary injunction, the Court therefore grants the motion. In the Court's view, the balance of equities favor Millennium and requires the Court to intervene to preserve the status quo until the merits are determined.

**ORDER**

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant and counterclaimant Millennium's motion for a preliminary injunction [Docket No. 5] is **GRANTED** as follows:

a. Until further Order of this Court, Slidell is hereby restrained and enjoined from the following:

1) Disassembling all or any portion of each of seven partially-constructed titanium dioxide packaging machines being built by Slidell for Millennium pursuant to the parties' contract dated March 17, 2000;

2) Selling, transferring or conveying in any manner, whether for or without value, to any entity other than Millennium, any legal or equitable right or interest, without limitation, in or to:

(a) Each of the aforesaid titanium dioxide packaging machines, and any components thereof;

(b) Any and all parts, subassemblies or other components which have been identified in the parties' contract for the aforesaid titanium dioxide packaging machines, regardless of whether such parts, subassemblies or other components have, or have not, been physically attached to or incorporated into the units themselves;

3) Committing, taking or causing or allowing to occur any other act, action or omission, without limitation, which would in any manner diminish the value of or otherwise interfere with Millennium's potential legal and equitable rights to

(a) Each of the aforesaid titanium dioxide packaging machines, and any components thereof;

(b) Any and all parts, subassemblies or other components which have been identified to the parties' contract for the aforesaid titanium dioxide packaging machines, regardless of whether such parts, subassemblies or other components have, or have not, been physically attached to or incorporated into the units themselves.

2. In accordance with Fed. R. Civ. P. 65(c), the preliminary injunction shall become effective upon defendant and counterclaimant posting a bond with the Clerk in the amount of Two Million Dollars ($2,000,000.00) for the payment of such costs and

damages as may be incurred or suffered by plaintiff in the event plaintiff is found to have been wrongfully enjoined.

3. The parties are ordered to meet and confer and reach agreement concerning storage of the subject equipment until a full determination of the merits can be made.

DATED: April 17, 2002
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge