**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

SLIDELL, INC.,

Plaintiff,

v.

MILLENNIUM INORGANIC CHEMICALS, INC.,

Defendant.

Civil No. 02-213 (JRT/FLN)

**MEMORANDUM OPINION AND ORDER**

---

Thomas S. Fraser, Jeffrey W. Post, and Jeffrey W. Jones, FREDRICKSON & BYRON, 4000 Pillsbury Center, 200 South Sixth Street, Minneapolis, MN 55402-1425, for plaintiff.

Scott A. Smith, Michael T. Nilan, Matthew E. Johnson and Amanda M. Cialkowski, HALLELAND, LEWIS, NILAN, SIPKINS & JOHNSON, 220 South Sixth Street, Suite 600, Minneapolis, MN 55402, for defendant.

Millennium Inorganic Chemicals, Inc. ("Millennium") hired Slidell, Inc. ("Slidell") to make equipment for use in three of Millennium's chemical plants. Slidell brought this diversity action against Millennium after Slidell came to believe that Millennium was undermining the contract and stealing Slidell's intellectual property. Millennium counterclaimed, asserting claims of breach of contract, specific performance, replevin and other equitable claims. The Court addressed this dispute in April of 2002, when the Court granted Millennium's request for a preliminary injunction preventing Slidell from disassembling the machines. The parties then brought cross motions for summary judgment, which are addressed in this Opinion and Order. The Opinion and

Order also addresses Millennium's motion to strike, which was brought after the oral argument.

## BACKGROUND

Slidell is a Minnesota company that designs, manufactures, and sells automated industrial packaging equipment systems. Millennium, a Delaware corporation, is an international chemical company, and manufactures and sells, among other inorganic products, the chemical titanium dioxide ("$TiO_2$"). $TiO_2$ is a commodity used to produce opacity in plastics. In the late 1990s, Millennium decided to improve three of its $TiO_2$ manufacturing plants; this improvement project called for the purchase of new automated packaging equipment. Millennium selected Slidell to supply the packaging equipment. In December of 1999, the parties executed a Letter of Intent ("LOI") in which Slidell stated its intent to design and manufacture, and Millennium stated its intent to purchase, a number of fully automated packaging machines for Millennium's use in the three plants. Millennium emphasizes that it chose Slidell because Slidell is the only company that uses a unique, "open mouth, vertical auger bottom fill" method, which is purportedly cleaner and more efficient than the alternative, "pneumatic valve fill" method.

The parties spent months negotiating the contract, including limitations of liability clauses, and other specifics. This contract involved seven lines of standard Slidell packaging equipment and three lines of "bulk baggers." The equipment was to be used in three Millennium plants—one in Ashtabula, Ohio; one in LeHavre, France; and one in Stallingborough, United Kingdom.

The parties finalized and executed the contract in April of 2000. Prior to any change order, the contract price was reported as $10,350,465. The payments were to proceed under a "milestone" based payment schedule outlined at paragraph 20 of the contract. The original contract price incorporated a discount of 12% premised upon the manufacture of "identical" units of packing equipment. (Contract ¶ 20(b).) According to other terms of the contract relevant to the dispute, the parties agreed that "title to the Goods shall remain with Slidell until the full purchase price (including installation and service costs) is paid." (Contract ¶ 3.) The parties also agreed that modifications to the contract could be effectuated through the execution of change orders. Section 19 provides that "Change Orders may be requested at any time by [Millennium] or [Slidell] to alter, add to, delete aspects of, or otherwise change the final scope of the project." (Contract ¶ 19.) The parties further agreed that should "the parties elect to proceed with such Change Order, a Change Order shall be executed by both parties and [Slidell] shall proceed with adjustments to the Project Schedule, the final scope of the project, the Contract Price or other aspects of the final scope of the project as defined in such Change Order." (*Id.*) Minor changes, the contract provided, could be made upon the consent of the parties. (Contract ¶ 19.) Finally, the parties confirmed that "[t]his Contract, including all of its exhibits, appendixes and attachments, comprises the entire agreement between [Millennium] and [Slidell]." (Contract ¶ 22.)

Work on the project proceeded slowly. Millennium claims that the work went slowly because of technical difficulties, and the parties' disagreements about the supervisory system. Slidell argues that the work went slowly because Millennium hindered Slidell in an attempt to manipulate the contract and force Slidell into making

significant concessions to complete the project. Slidell argues that Millennium did everything possible to interfere with Slidell's progress—including unnecessary audits and meetings, change orders, and other obstructionist tactics. The parties agree that two issues in particular caused problems—wire color-coding and the equipment's supervisory control system.

Wire coding became a problem when it was brought to the parties' attention that the wire colors specified in the contract might not fully comply with all applicable US, UK, and European standards. The parties agreed to a Change Order (Change Order No. 3) in an attempt to resolve the wire coding issue. Later, however, they agreed to return to the original specifications concerning wire color. (Change Order No. 4.)

Another key aspect of these motions is the dispute surrounding the equipment's supervisory control and data acquisition system, referred to by the parties as SCADA. This system is the software interface between the packaging units and Millennium's accounting system. The cost for SCADA was in the initial contract at about $350,000. Slidell claims that Millennium requested improvements that increased the price to about $2 million. At some point, Millennium decided to have RoviSystems ("Rovi") complete the SCADA work. Slidell accuses Millennium of deciding to have Rovi do the SCADA, and then tricking Slidell into finishing as much of the planning/designing as possible. Slidell alleges that Millennium then gave Slidell's work product to Rovi, which allowed Rovi to offer to complete the project at a significantly lower price. Millennium claims that the SCADA is not done, and that it gave Rovi only information that it was authorized to share via amendments to the contract. This dispute is addressed in Change Order No. 5, which Slidell argues never became effective because although Slidell tentatively

agreed to the Change Order, Slidell changed its position and did not execute the Change Order.

Though work proceeded slowly, proceed it did. In the spring of 2000, Slidell offered to deliver a substantial portion of the equipment to Millennium's plant in Stallingborough, UK. Millennium acknowledged, in July of 2000, that it had indicated to Slidell "with 98% certainty" that early delivery of the particular equipment was acceptable. (Ex. AA to Aff. of Jeffrey W. Post.) That decision, however, was reversed. (*Id.*) Slidell suggests that the decision was reversed as part of a plan to force additional contractual concessions from Slidell.

By the spring of 2001, the project remained behind schedule, and a review of the record evidence indicates that the parties' relationship was significantly strained. There was a brief reprieve to this strain, when Millennium's original project manager left the job, but by late summer of 2001, yet another issue arose when the parties disputed whether the 12% discount rate should continue to apply. This dispute was not resolved. In January of 2002, Slidell commenced this action.[1]

## ANALYSIS

### I. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

[1] As its own background observation, the Court notes that to the casual observer (and perhaps also to a more studied observer), this case seems prime for settlement. Slidell has completed substantial work on the machines. Millennium keenly desires those particular machines, and Slidell keenly wants to be rid of them.

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002).

## II. SLIDELL'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND OTHER RELIEF

Slidell's request for partial summary judgment can be divided into the following arguments: First, arguing that "contract price" does not mean "**unpaid** contract price," Slidell seeks a ruling that its damages are not limited to what Millennium has yet to pay

on the contract. In a similar vein, Slidell requests a ruling that Millennium cannot recover damages excluded by the contract language. Next, Slidell requests summary judgment on Millennium's equitable claims[2], and its claims on behalf of nonparties (French and UK corporations which have purportedly assigned their claims to Millennium). The Court addresses these arguments in turn.

### A. "Contract Price"

The contract provides that "[Slidell] further agrees in no event shall [Millennium] have liability for direct damages **in excess of the contract price** of the portion of the goods or services in respect to which a claim is made, whether such claim arises out of contract, negligence, tort or otherwise."[3] (Contract ¶ 4.)

The Court made passing reference to this particular contract term in a footnote in its previous order granting Millennium's request for a preliminary injunction. This contract term, however, was not at issue in the preliminary injunction motion and the Court did not have the benefit of full briefing on the import of the clause. The previous footnote certainly does not constitute a holding, and is not the law of the case. "The decision of a trial or appellate court whether to grant or deny a preliminary injunction does not constitute the law of the case of further proceedings and does not limit or preclude the parties from litigating the merits." *Travelers Ins. Co. v. Westridge Mall Co.*, 826 F. Supp. 289, 293 n.2 (D. Minn. 1992) (citing *Berrigan v. Sigler*, 499 F.2d 514 (D.C.

---

[2] Slidell sought summary judgment on Count IV (Unjust Enrichment). Millennium voluntarily dismisses Count IV of the First Amended Counterclaim.

[3] This clause is in all capital letters in the contract. For ease of reading, the Court uses upper and lower case letters in this Opinion.

Cir. 1974)). The Court is free to visit this issue, and plaintiff is free to invite the Court to do so, without a motion for reconsideration.

The Court is not persuaded, however, that summary judgment is appropriate on this issue. While it is true that in some instances, summary judgment on an affirmative defense is available, this is not such a situation. Summary judgment is designed to dispose promptly of actions or claims. *See* 10A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2712 (2d ed. 1997). Where an affirmative defense is fairly considered a separate claim, or where an affirmative defense will absolve a party of liability, it is appropriately dealt with on summary judgment. The affirmative defenses of, for example, qualified immunity or preemption are properly addressed in a summary judgment motion. *See, e.g., Gatlin ex rel. Gatlin v. Green*, 362 F.3d 1089, 1093(8th Cir. 2004) (discussing summary judgment based on the affirmative defense of qualified immunity); *Selkridge v. United of Omaha Life Ins. Co.*, 360 F.3d 155 (3d Cir. 2004) (affirmative defense of preemption); *Martin v. Alamo Community College Dist.*, 353 F.3d 409 (5th Cir. 2003) (discussing affirmative defense of statute of limitations).

Rule 56(d) allows what courts have referred to as "partial summary judgment."[4] Partial summary judgment, is not, however, a vehicle to obtain judgment on a **portion** of

---

[4] Specifically, Fed. R. Civ. P. 56(d) provides

> If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion . . . shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of

(Footnote continued on next page.)

a claim. *See B. Bros. Packaging, Inc. v. South/Win Ltd.*, 2002 WL 424593 *3 (D. Minn. March 18, 2002); *see also Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.*, 553 F. Supp. 962 (N.D. Ill. 1982) (holding that partial summary judgment is not authorized where the relief sought is "[e]ssentially . . . a ruling that certain . . . *damages* cannot be assessed or have not been proved") (emphasis in original); *Triangle Ink & Color Co., Inc. v. Sherwin-Williams Co.*, 64 F.R.D. 536, 537 (N.D. Ill 1974) (summary judgment may not be granted "for any portion of a claim less than a whole").

The relief requested by plaintiff here – an opinion from the Court that damages are not limited to the "unpaid contract price" – is not a proper category for either summary judgment or partial summary judgment. The requested relief would not expedite this matter, or eliminate a claim or defense, because even if the Court granted plaintiff's requested relief, the jury would be required to make the same determinations. This is not an instance in which plaintiff requests that defendant not be allowed to pursue a **type** of damages—rather, this is a request that the Court announce an overall cap on damages (or more accurately, that the Court announce a higher cap on damages).

Perhaps recognizing the limitation of summary judgment in this context, Slidell invites the Court to address this issue as a motion in limine. The Court declines this invitation. Generally, the purpose of a motion in limine is to prevent the introduction of improper evidence, the mere mention of which at trial would be prejudicial. That does not appear to be the ruling plaintiff seeks; rather, plaintiff seeks an opinion that its

(Footnote continued.)

> damages or other relief is not in controversy, and directing such further proceedings in the action as are just.

damages (regardless of the category) will not be capped at a certain amount. Given the Court's previous footnote, it was entirely appropriate for plaintiff to clarify that this issue remains open. At this time, however, it is enough to note that the previous footnote does not constitute a holding, and the parties will have ample opportunity to address this issue at the appropriate time.

### B. Damages Excluded by the Contract

The contract contains a limitation of liability clause providing that:

> Owner [Millennium] agrees that the remedies provided herein for breach of warranty are the exclusive remedies for any such breach. **In no event shall contractor [Slidell] have liability for direct damages in excess of the contract price of the portion of the goods or services in respect to which a claim is made**, whether such claim arises out of warranty or other contract, negligence or other tort, or otherwise. Owner [Millennium] further agrees that **in no event shall contractor [Slidell] have any liability for loss of use**, **loss of profits or any indirect, incidental, consequential, punitive or other damages**, including those of [Millennium], its customers or others, whether such damages are based upon warranty or other contract, negligence or other tort, or otherwise.

(Contract at ¶ 4 (emphasis added).[5])

Millennium's expert report sets out three types of damages, (1) Millennium's actual expenditures on the project; (2) damages from delay of "mothballed investments;" and (3) damages for delayed benefits. (Smith Aff. Tab 11, Report of Phillip S. Williams at Exhibit 1.) Slidell argues that most of these claimed damages are precluded by the damages limitation clause. Specifically, Slidell argues that damages purportedly incurred

[5] This clause is in all capital letters in the contract. For ease of reading, the Court uses upper and lower case letters in this Opinion. The Court also notes that the damages exclusion is not reciprocal—that is, while Millennium is precluded from recovering damages stemming, for example, from "loss of use" and "loss of profits;" Slidell is not so limited. (Contract ¶ 4.)

that stem from "investing too early in changes to the facilities," and losses associated with delays in the benefits from the new equipment are "indirect" and therefore excluded by the contract. Slidell requests that the Court conclude as a matter of law that the losses identified in the damages report are excluded by the contract. Slidell also argues that its total liability is capped at the unpaid portion of the contract price.

As with the damages cap discussed above, the Court is not convinced that these issues are appropriate for summary judgment. Also for the reasons discussed above, Slidell's argument that Millennium's total damages are capped at the amount of progress payments made is not appropriate for summary judgment or a motion in limine. The parties also discuss how to characterize certain categories of damages, and this "categorization" issue is more appropriate for a motion in limine, as plaintiff seeks the exclusion of entire categories of damages. Although the Court will not address a motion in limine at this time, preferring to wait until shortly before trial, the Court observes that Millennium concedes that it cannot recover for lost profits or damages stemming from loss of use; indeed, given the language of the contract, any other argument would be specious. (Contract ¶ 4.) Millennium also concedes that it cannot recover for any indirect, incidental, or consequential damages. (Contract ¶ 4.) Costs of cover, as a matter of Minnesota law, are incidental damages, and therefore it does not appear that such damages could be recovered by Millennium. Minn. Stat. §336.2-715(1) ("Incidental damages resulting from the seller's breach include . . . any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach."); *Simeone v. First Bank Nat'l Ass'n*, 73 F.3d 184, 189 (8th Cir. 1996).

Millennium's expert report contains categories of damages that appear expressly excluded by the contract language. This inclusion is not surprising, given the expert's explicit disclaimer of consideration of a limitation of liability clause. To the extent damages in the expert report reflect lost profits and losses associated with delay, they are properly excluded as a matter of law, prior to trial.[6] To the extent it is unclear whether a particular category of damages constitutes lost profits or some other excluded damages category, it will likely be an issue for the finder of fact. *See Rindahl v. Nat'l Farmers Union Ins. Co.*, 373 N.W.2d 294, 299 n.2 (Minn. 1985) (noting difficulty in defining the term "lost profits").

**C. Specific Performance and Replevin**

In Count II of Millennium's First Amended Counterclaim, Millennium makes a claim for specific performance and requests that Slidell be obligated to complete the contract, including delivery, installation, and start-up and testing. Count III is a claim for replevin. Both specific performance and replevin are equitable remedies expressly allowed by the Uniform Commercial Code ("UCC"). In particular, the UCC provides that "[s]pecific performance may be decreed where the goods are unique or in other proper circumstances." Minn. Stat. § 336.2-716(1). It further provides that a buyer has a right of replevin for goods identified in the contract if after reasonable effort the buyer is

[6] Millennium has not suggested that the asymmetry of the limitation of liability clause should not be enforced. Such an argument would likely be unavailing. *See, e.g.*, *LaSociete Generale Immobiliere v. Minneapolis Cmty Dev. Agency*, 44 F.3d 629, 637 (8th Cir. 1994) ("[W]here . . . two sophisticated parties negotiated a commercial contract which was executed in the absence of fraud, duress, or any other form of unconscionability, we will not rewrite the contract in order to save a contracting party from its own poor decisions.").

unable to effect cover for the goods, or where the circumstances reasonably indicate that efforts to cover will be unavailing. Minn. Stat. § 336.2-716(3).[7]

As equitable remedies, neither specific performance nor replevin is proper if the party seeking the remedy has not performed fairly, equitably, and honestly as to the particular controversy. *Ellwood v. Mid States Commodities, Inc.*, 404 N.W.2d 174, 184 (Iowa 1987). Courts do not permit parties seeking equitable relief to claim the benefit of their own inequitable conduct. *Ohio Oil Co. v. Sharp*, 145 F.2d 303, 307 (10th Cir. 1943); *Healthpoint, Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817, 847-48 (W. D. Tex. 2001) (emphasizing that the inequitable conduct must be related to the controversy "The unclean hands doctrine does not purport to search out or deal with the general moral attributes or standing of a litigant.") (internal quotation omitted).

Slidell argues that Millennium's refusal to accept delivery of the Stallingborough pallatizer for the sole purpose of forcing Slidell into extra-contractual concessions amounts to inequitable conduct that forfeits Millennium's right to seek equitable relief. It is unclear from the current record, however, that Millennium was obligated to accept the delivery. The parties dispute the factual basis for Slidell's allegations of inequitable conduct, and the Court cannot find at this time that the refusal to accept delivery amounts

[7] In its pertinent part, the statute provides:

> (3) The buyer has a right of replevin for goods identified to the contract if after reasonable effort the buyer is unable to effect cover for such goods or the circumstances reasonably indicate that such effort will be unavailing or if the goods have been shipped under reservation and satisfaction of the security interest in them has been made or tendered. . . .

to inequitable conduct so as to prevent Millennium from pursuing this claim. The Court therefore turns to Slidell's additional rationales.

In addition to having "clean hands" a party seeking specific performance must show that the goods are unique, or other special circumstances apply.[8] There is no simple legal test for determining whether an item is "unique" as that term is understood in the UCC context. Factors that courts have found relevant to this inquiry include, among others, whether an item is custom built, whether the item has historical or sentimental significance, and whether the item was designed to particular specifications. *See, e.g.*, *Colorado-Ute Elec. Ass'n v. Envirotech Corp.*, 524 F. Supp. 1152 (D. Colo. 1981); *Ruddock v. First Nat'l Bank of Lake Forest*, 559 N.E.2d 483 (Ill. Ct. App. 1990); *Cumbest v. Harris*, 363 So. 2d 294 (Miss. 1978).

On this record, Slidell has not established that it is entitled to summary judgment on the basis that the machines are not "unique."[9] It does not appear in dispute, on this record, that no company has replicated the method by which Slidell's machines fill bags with $TiO_2$. Millennium argues that this method makes the machines "unique," at least

[8] Of course, showing that the goods are unique is not enough: "A party does not have an automatic right to specific performance as a remedy for breach of a contract; the district court must balance the equities of the case and determine whether the equitable remedy of specific performance is appropriate." *Pope Mfg. Co. v. Gormully*, 144 U.S. 224, 237 (1892); *Dakota County HRA v. Blackwell*, 602 N.W.2d 243, 244 (Minn. 1999) (citing *Boulevard Plaza Corp. v. Campbell*, 94 N.W.2d 273, 284 (Minn. 1959)).

[9] Even if the machines are not "unique," the UCC provides that specific performance might be available if "other proper circumstances exist." Because the Court determines that a jury might find that the machines are indeed unique, the Court will not address Slidell's argument that no "other proper circumstances" exist.

unique "enough"[10] so that Millennium ought to be allowed to pursue specific performance.

Even if the machines are "unique," if Millennium can "cover" by obtaining substitute machines, the equitable remedy of replevin is not appropriate. There is no doubt that Millennium can obtain other machines to fill bags with titanium dioxide. The question is whether those substitute machines are like-kind machines that would be adequate replacements if Slidell is found to have breached its obligations under the contract. To prevail on a replevin claim, Millennium will be required to show that it has made reasonable efforts to cover by purchasing substitute machines. *T and T Air Charter, Inc. v. Duncan Aircraft Sales*, 566 So.2d 361, 362 (Fla. Ct. App. 1990). Questions of cover, including whether a buyer has made a reasonable attempt to cover, are usually questions for the trier-of-fact. *Upsher-Smith Labs., Inc. v. Mylan Labs., Inc.*, 944 F. Supp. 1411, 1433 (D. Minn. 1996). There is evidence in the record at this point that Millennium has made some efforts to cover. Contrary to Slidell's characterization, however, the record does not establish that Millennium's efforts have been successful.

These are fact issues the Court cannot resolve at summary judgment. The Court cannot find, on this record, that the machines are not "unique." Construing all reasonable inferences in favor of Millennium, the Court similarly cannot find as a matter of law that

[10] A grammarian might take issue with the notion that there are degrees of "uniqueness;" for these purposes the Court dispenses with this apparently outmoded formalism. *See Merriam-Webster Online Dictionary*, entry for "unique" at http://www.m-w.com ("Many commentators have objected to the comparison or modification (as by *somewhat* or *very*) of *unique;* the statement that a thing is either unique or it is not has often been repeated by them. Objections are based chiefly on the assumption that *unique* has but a single absolute sense, an assumption contradicted by information readily available in a dictionary.").

the replacement machines that Millennium would be able to purchase are comparable to those contemplated by the contract. Therefore Slidell is not entitled to summary judgment on Counts II or III of Millennium's First Amended Counter-Claim.[11]

### D. Equitable Lien

An equitable lien "is essentially a form of a constructive trust." *Fredin v. Farmers State Bank of Mountain Lake*, 384 N.W.2d 532, 535 (Minn. Ct. App. 1986) (citing D. Dobbs, Handbook on the Law of Remedies § 4.3, at 249 (1973)). An equitable lien "arises in an equity proceeding when a [party] is allowed to reach the property of another and hold it as security for a claim on the ground that otherwise the latter would be **unjustly enriched**." *Id.* (emphasis added) (citing *Borsgard v. Elverum*, 80 N.W.2d 604, 610 (1957) (quoting Restatement of Restitution § 161, at 650 (1937)). In limited instances, courts have awarded equitable liens on "considerations of right and justice." *Lindell v. Lindell*, 185 N.W. 929, 930 (1921) (awarding equitable lien on theory of unjust enrichment where daughter-in-law sued to quiet title to land that father-in-law gifted to son; son died intestate and daughter-in-law invoked the court's equitable powers to quiet title, relying on fact that son had made improvements to land to obtain title; in second lawsuit, father-in-law was awarded equitable lien because he had loaned son the money to make those very improvements). *See, e.g., Timmer v. Gray*, 395 N.W.2d 477, 479 (Minn. Ct. App. 1986) (awarding equitable lien to repairperson because "[t]he failure of

---

[11] Both specific performance and replevin are equitable remedies, and as such are legal, rather than jury questions. However, assuming this case goes to trial, the jury likely will be asked to determine whether the machines are unique. Assuming further that the jury answers that question in the affirmative, the Court will then determine whether equitable relief is appropriate.

consideration, mistake and moral wrongness encompassing this case mandates imposition of an equitable lien based on the theory of unjust enrichment.”).

In this case, there was no promise by Slidell to give Millennium a security interest in the machines. To the contrary, the record evidence indicates that the parties, two sophisticated entities, negotiated at arm’s length for this particular contract provision and expressly provided that title would remain with Slidell. Even assuming the facts in the light most favorable to Millennium, there are no grounds to proceed with this claim. Slidell has received progress payments, and in fact, has received a significant sum as progress payments, but Slidell completed work on the machines in exchange for the payments.[12] The parties negotiated the payment schedule, and Millennium was free to negotiate a lower rate, or a different payment schedule. Slidell has not been unjustly enriched by the receipt of progress payments; and an equitable lien cannot proceed on Millennium’s theory that it has been unjustly “unenriched.”

### E. Constructive Trust

“A constructive trust may arise in favor of a person equitably entitled to property when legal title to the property is obtained through fraud, oppression, duress, undue influence, force, crime, or similar means, or by taking improper advantage of a confidential or fiduciary relationship.” *Fredin v. Farmers State Bank of Mountain Lake*, 384 N.W.2d 532, 535 (Minn. Ct. App. 1986). Instances in which Minnesota courts impose constructive trusts typically involve clear instances of fiduciary or confidential

[12] It is not clear from the record that the percentage of work completed was exactly correlated to how much money Millennium paid at a particular “milestone.” It is clear, however, that Slidell has completed more than minimal work on the machines.

relationships. *See, e.g.*, *Dietz v. Dietz*, 70 N.W.2d 281, 334 (Minn. 1955) (confidential relationship between parent and child sufficient to impose constructive trust where parent relied on child for advice); *Shepherd of the Valley Lutheran Church of Hastings v. Hope Lutheran Church of Hastings*, 626 N.W.2d 436 (Minn. Ct. App. 2001); *Freundschuh v. Freundschuh*, 559 N.W.2d 706, 711 (Minn. Ct. App. 1997) (noting that "the fiduciary relationship in a strict sense is not a prerequisite, and any relationship giving rise to justifiable reliance or confidence is sufficient").

Millennium asserts that a fiduciary relationship exists that justifies Millennium's pursuit of a constructive trust in this case. (First Amended counterclaim at Count VI ¶ 33.) A fiduciary relationship arises where a party reposes confidence in the other party, and that other party exerts, or can exert, domination and influence over the first party. Black's Law Dictionary 626 (6th ed. 1991). On the other hand, "[a] fiduciary relationship does not arise when the parties negotiating a contract are dealing at arm's length." *Soomekh Oriental Rugs v. Target Corp*., 2001 WL 1619453 (D. Minn. April 27, 2001), *aff'd* 2002 WL 1343831 (8th Cir. Jun 21, 2002) (citing *Shema v. Thorpe Bros.*, 62 N.W.2d 86, 91 (Minn.1953); *Klemme v. Long*, 237 N.W. 882, 884 (Minn. 1931); *Walker v. Patterson*, 208 N.W. 3, 5 (Minn. 1926)); *see also Sutton v. Viking Oldsmobile Nissan, Inc.*, 2001 WL 856250, *3 (Minn. Ct. App. July 31, 2001) (no fiduciary duty where parties dealing at arm's length). In this case, there is clearly no fiduciary or confidential relationship between these parties. Legal title to the machines at issue was not obtained fraudulently, or by any similarly inequitable means. Slidell has established that it is entitled to summary judgment on Millennium's constructive trust claim.

**F. Claims asserted by UK and French Entities**

In this case, two of the three plants to which the machines were destined are owned not by Millennium Inorganic Chemicals, Inc., but by separate but related legal entities charted under English and French law. After this lawsuit commenced and after the close of discovery, the entities that own the Stallingborough, UK plant and the Le Havre, France plant purported to assign their claims against Slidell to Millennium. These claims include damages for construction costs, lost profits, and loss of use.[13]

Slidell attacks these assignments as untimely and prejudicial, and requests that the assignments not be allowed, or in the alternative, that if assignments are allowed, that the parties be added to the case so that Slidell may assert potential counterclaims. Millennium asserts that the European entities are third-party beneficiaries and Millennium is entitled to state claims on their behalf as the real party in interest pursuant to Rule 17 of the Federal Rule of Civil Procedure.[14] Nonetheless, Millennium argues that the assignments are appropriate, timely, do not prejudice Slidell, and therefore should be allowed.

**1. Third-Party Beneficiaries**

In general, persons who are not parties to a contract but benefit from its performance are merely incidental beneficiaries and have no rights under the contract.

[13] The Court expresses no opinion on the propriety or categorization of the purported losses.

[14] The rule provides, in pertinent part: "Every action shall be prosecuted in the name of the real party in interest . . . [A] party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought . . ."

*Wurm v. John Deere Leasing Co*., 405 N.W.2d 484, 486-87 (Minn. Ct. App. 1987). A stranger to a contract may assert a contractual claim as a "third-party beneficiary" if the contract was made for that party's direct benefit. *See Buchman Plumbing Co. v. Regents of the Univ. of Minn.*, 215 N.W.2d 479, 483 (1974). Minnesota courts recognize third-party beneficiary rights where "(1) such recognition is 'appropriate' under the circumstances, and (2) the third party meets either the 'intent to benefit' test or the 'duty owed' test." *Dayton Dev. Co. v. Gilman Fin. Services, Inc*., 299 F. Supp. 2d 933, (D. Minn. 2003) (citing *Cretex Constr. v. Constr. Leaders*, 342 N.W.2d 135, 139 (Minn. 1984)).

The potentially applicable test here is the intent to benefit test, which "generally requires that 'the contract must express some intent by the parties to benefit the third party through contractual performance.'" *Norwest Fin. Leasing, Inc. v. Morgan Whitney*, 787 F. Supp. 895, 898 (D. Minn. 1992) (quoting *Chard Realty v. City of Shakopee*, 392 N.W.2d 716, 720-21 (Minn. Ct. App. 1986)).[15] The intent-to-benefit test is satisfied when "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Mears Park Holding Corp. v. Morse/Diesel, Inc.*, 427 N.W.2d 281, 285 (Minn. Ct. App. 1988) (quoting Restatement (Second) of Contracts § 302(1)(b)). The requisite intent must be found in the contract as read in light of all the surrounding circumstances. *Buchman Plumbing Co. v. Regents of the Univ. of Minn.*,

[15] The "duty owed" test, requires "that the promisor's performance under the contract must discharge a duty otherwise owed the third party by the promisee." *Cretex Constr.*, 342 N.W.2d at 139.

215 N.W.2d 479, 483 (Minn. 1974). If no intent to benefit has been shown, the third party is only an incidental beneficiary and cannot enforce the contract. *Id*. at 483-84.

The contract language refers only to defendant Millennium (referred to as "Owner" in the contract) and does not mention the foreign entities. The contract also expressly refers, however, to the LeHavre and Stallingborough pl ants. There can be little question that the contract contemplated benefiting those plants, regardless of who "technically" owned the plants. It is also clear that early in the parties' relationship, Slidell was aware that the LaHave and Stallingborough plants were not "technically" owned by defendant Millennium, but that the machines were to be sent to those plants, for the benefit of those plants. The plants are therefore intended beneficiaries with the right to attempt to enforce the contract.

**2. Assignment**

Slidell argues that even if the foreign entities have rights to assign, the assignment should not be allowed because it was untimely and prejudicial. As an initial matter, an assignment is not ineffective simply because it was made after filing a lawsuit. *See Dubuque Stone Products Co. v. Fred L. Gray Co.*, 356 F.2d 718, 724 (8th Cir. 1966) (assignment effective if made after filing, but before trial where no prejudice to defendant); *Infodek, Inc. v. Meredith-Webb Printing Co.*, 830 F. Supp. 614, 620 (N.D. Ga. 1993).

Slidell argues that it is **potentially** prejudiced by not having an opportunity to assert counterclaims against the foreign entities, and suggest that in the future its claims against the entities might be barred by res judicata. The Court notes that Slidell could have moved to join the foreign entities, and it is clear that the "technical" ownership of

the foreign entities was known to Slidell. In addition, Slidell does not identify what counterclaims it would bring against the foreign entities. The Court will allow the assignment. Slidell has identified that **potential** areas of prejudice, but has not established that the assignment in fact creates prejudice.

In the alternative, Slidell requests permission to assert counterclaims against the foreign entities. In deciding whether the allow counterclaims, the Court balances the amorphous and potential concerns identified by Slidell with the certain delay that would result if the Court allowed the counterclaims. The Court also considers Slidell's failure to establish that its counterclaims are necessary for it to be afforded complete relief in this matter. Balancing these concerns, the Court concludes that it will not allow Slidell to assert counterclaims against the foreign entities at this time.

## III. MILLENNIUM'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Millennium seeks partial summary judgment on its first Counter Claim (Count I—Breach of Contract), and also seeks summary judgment on **all** of Slidell's claims against Millennium.

### A. Millennium's Claim for Breach of Contract

Millennium argues that it has made payments on the machines, has not received anything in return, and is entitled to summary judgment on its breach of contract claim. Millennium argues that Slidell has breached by failing to deliver the machines in a "reasonable time." *See* Minn. Stat. § 336.2-309(1) (where there is no time for delivery set forth in the contract, delivery shall occur within a "reasonable time). Slidell counters that any breach on is part was caused by multiple breaches on Millennium's part. Slidell

identifies at least four alleged breaches: (1) Millennium's failure to provide necessary specifications; (2) Millennium's refusal to refund the discount; (3) Millennium's attempts to force extra-contractual concessions from Slidell; (4) Millennium's violation of nondisclosure and software licensing agreements.

"[A] party who first breaches a contract is usually precluded from successfully claiming against the other party." *Carlson Real Estate Co. v. Soltan*, 549 N.W.2d 376, 380 (Minn. Ct. App. 1996) (citing *Space Ctr., Inc. v. 451 Corp.*, 298 N.W.2d 443, 451 (Minn. 1980) (17A C.J.S. Contracts § 458 (1963)); *see also MTS Co. v. Taiga Corp.*, 365 N.W.2d 321 (Minn. Ct. App. 1985) (holding that first breaching party could not sue on the basis of the other party's subsequent breach because (1) the initial breach was continuing at the time that the first breaching party brought the action against the subsequent breacher, and (2) the subsequent breach resulted directly from the initial breach). "The first breach serves as a defense against the subsequent breach." *Carlson Real Estate Co.*, 549 N.W.2d at 380.

Slidell claims that Millennium hindered its performance of its contractual obligations. *See Zobel & Dahl Const. v. Crotty*, 356 N.W.2d 42, 45 (Minn. 1984). "[E]very contract contains an implied condition that each party will not unjustifiably hinder the other from performing. *Id.* (citing J. Calamari and J. Perillo, *The Law of Contracts*, 441-444 (1977)) *see also Kaltoft v. Nielsen*, 106 N.W.2d 597, 602 (Iowa 1960) (construction contracts contain implied terms that person for whom work will be done will not obstruct or delay contractor). Unjustifiable hindrance that prevents the other party's performance amounts to a breach. *Zobel & Dahl Const.*, 356 N.W.2d at 45.

Slidell cites a litany of allegedly hindering behavior on Millennium's part that Slidell argues prevented Slidell's performance. For example, Slidell suggests that Millennium failed to respond on specification issues, and that failure prevented Slidell from progressing on the project. Minn. Stat. § 336.2-311(3) (failure to timely provide specifications material to the other parties performance excuses the other party for any resulting delay; other party can either proceed in commercially reasonable manner **or** treat as breach). Slidell points to evidence of outstanding specification issues, including the layout of one of the plants, the check weigher, a disputed change order, and the electrical design for one of the plants. Millennium disagrees that these issues were outstanding. This highlights a material fact dispute that the Court cannot resolve on the basis of competing affidavits and deposition testimony. As another example, although Millennium claims the "technical issues" were all resolved when Paul Berwanger took over as project manager, Slidell disputes this factual contention, and points to evidence in the record that would allow a reasonable fact-finder to conclude that even after critical issues were purportedly "resolved" those issues remained open.[16]

These and other disputes of material fact remain that preclude the Court's determination that any breach by Millennium was unrelated to Slidell's failure to deliver the machines in a reasonable time. A reasonable jury could find that Millennium's alleged actions (and inaction) were related to, and in the end caused Slidell's (alleged) breach. This is not a case in which the Court can find, as a matter of law, that the alleged

[16] For example, Slidell points out that the size of shipping containers was instrumental to the design of the machines. Although Millennium "resolved" the issue, Millennium continued to address shipping issues through at least the spring of 2001.

breaches are unrelated. A reasonable jury could find that Millennium intended to hinder performance and unjustifiably delay the project. Similarly, a reasonable jury could find that Millennium breached the contract by conditioning its performance of the contract on Slidell's acquiescence to change orders. While the contract provided that the parties could seek change orders at any time, it nowhere provided that either party could condition its further performance of the contact on the other party's acquiescence to a change order. In sum, numerous fact issues preclude summary judgment on Millennium's breach of contract claim.

## B. Slidell's Counterclaims

### 1. Slidell's Breach of Contract Claim

The parties' breach of contract claims are related, and for many of the same reasons outlined above, summary judgment in favor of Millennium is not appropriate on Slidell's breach of contract claim. For example, the parties disagree about whether Millennium made payments in a timely fashion, and whether Millennium ever made a particular $38,249 payment. The parties also disagree about whether Millennium breached its duty of good faith. Similarly, the parties disagree about whether the 12% discount for production of identical machines continued to apply. The Court is unable, on this record, to grant summary judgment on either party's breach of contract claim. These are claims that must be submitted to a jury.

### 2. Slidell's Trade Secret Claims

In paragraph D of the Complaint, Slidell alleges that Millennium violated the contract and the Uniform Trade Secrets Act by using Slidell's trade secrets to its

advantage. Slidell's claim is premised on the allegation that Millennium wrongfully transferred Slidell's proprietary information related to development of SCADA.[17] These systems include microprocessors located in the equipment, the network design for transmitting information between the microprocessors and the supervisory program, and the operating systems and control programming that monitors the data generated throughout the system. The original contract provided that Slidell would design the system at an estimated cost of about $350,000.[18] The parties dispute what was included in the initial estimate, but at some point Millennium employees drew up a "wish list" of the systems capabilities. Slidell suggests that the "wish list" constituted a dramatic upgrade from what was included in the initial contract. Millennium then authorized a change in scope to the supervisory system. Slidell spent several months developing the work, and eventually proposed a change order pricing the system at just under $2 million.

In March of 2001, it appeared that the parties had reached a compromise on the supervisory system, and Millennium employees indicated to Slidell to go ahead with the project. (E-mail string between Phil Williams, Mark Ramsay and Conrad Porter at Tab 132 of Post Aff.) Despite this appearance of going forward, Slidell suggests that Millennium had already decided to remove the supervisory system from the contract. Millennium did not, according to Slidell, inform Slidell of this decision until another two months had passed and Slidell had nearly completed the system. The next step in this dispute appears to be the negotiation of Change Order Number 5, which Slidell claims

[17] As noted above, the parties refer to the equipment's supervisory control and data acquisition system as SCADA.

[18] The parties dispute whether the $350,000 is an estimate.

was not executed. The parties dispute the effectiveness of Change Order Number 5. Slidell suggests that once it became clear that Millennium was unwilling to compensate Slidell for indirect costs associated with the supervisory system delay, it refused to accede to the change order.

Sometime during this dispute, Slidell came to believe that Millennium had transferred proprietary information to a third party, in contravention of the contract and Minnesota law. The confidentiality of this proprietary information is set out in Exhibit A to the contract. Specifically, the contract provides that "[t]he receiving party shall not disclose any Information to any of its employees unless it is necessary to do so for the design, production, evaluation or operation of the proposed equipment and such third party is bound to protect the confidentiality of such Information." The next paragraph further provides that "[e]ach party . . . further agrees to not divulge such Information to any third party (except disclosures to its own employees permitted above) without the prior written consent of the other party for the term of this Agreement."

Slidell has established a prima facie case that Millennium breached the confidentiality agreement in the contract. Millennium employees concede that information was transferred to RoviSys without Slidell's consent. The clause in the contract on which Millennium relies for the proposition that such transfers were authorized is inapposite. The applicable section precludes transfers to third parties without prior written consent. There is no question that Millennium did not have prior written consent before transferring the information to third parties.

Slidell has also established a prima facie case that it has been damaged by the wrongful disclosures, and Millennium has not established that the parties intended an

exclusive remedy provision. Under Minnesota Trade Secrets Act, an aggrieved party is entitled to both actual loss and the unjust enrichment caused by the misappropriation. Millennium suggests that, regardless of any bad acts on its part, Slidell cannot recover because its damages are too speculative. Slidell's burden is not high, "so long as there is proof of a reasonable basis upon which to approximate the amount [of damages]," the difficultly in proving its amount will not preclude recovery. *Children's Broadcasting Corp. v. Walt Disney Co.*, 245 F.3d 1009, 1016 (8th Cir. 2002). In many trade secret cases, damages are difficult to establish. That fact alone does not shield potential bad actors from liability. Slidell has pointed to specific, admissible evidence that would enable a reasonable fact finder to assess damages without resorting to speculation. Summary judgment in Millennium's favor on this claim is denied.

### 3. Slidell's European Support Claims

Slidell's claim stems from expenses incurred in setting up a European office to provide technical support to Millennium once the equipment was installed and operating in the UK and France. The parties agree that extensive negotiations took place regarding Slidell providing European support, but dispute whether an agreement was actually reached. The parties exchanged drafts of agreements and proposals, but, according to Millennium, the parties never reached agreement on critical issues and never reduced their understandings to writing, and, importantly, Millennium denies promising to reduce the terms to a writing.

Slidell's recitation of the material facts differs. Slidell insists that Millennium demanded European support, and that several terms of the support agreement were

incorporated into Exhibit F of the original contract (hourly rate, for example). Slidell also asserts that Millennium encouraged Slidell to hire European employees, and promised to make a retainer payment. Slidell suggests that there was internal disagreement at Millennium regarding the support, and that those individuals on the "pro-support" side of the disagreement misled Slidell. Despite the alleged internal disagreement at Millennium, Millennium employee Mike Brewer purported to reach a retainer agreement with Slidell, and communicated to Slidell that Millennium "would commit to an 18-month contract or hiring of a technical field support person . . ." (Brewer Aff. at 57, 69 Tab 7 to the Post Aff.) Slidell president Jim McGregor testified in deposition that he pressed Millennium employee Brewer to "put something in writing," and "he [Brewer] said he would work on it." (J. McGregor depo. at 203, Tab 14 to Post Aff.; *see also* Ex. 316, E-mail from Mark Ramsay at Tab 67 to Post Aff.,; McGregor Aff. at 203 at Tab 14 to Post Aff.) Brewer testified in his deposition that it was communicated to Slidell in a meeting that Millennium would "set up a, a blanket purchase order to cover the cost for [the second engineering support person]." (Brewer depo. 70, Tab 7 to Post Aff.). Brewer further testified that Slidell communicated to him that Slidell was going ahead to contract with a European field support person, and that this go-ahead "was an agreed item." (Brewer depo. 73, Tab 7 to Post Aff.)

**a. Goods or services**

Before the Court delves too far into the protracted arguments raised by the parties,[19] the Court must determine the legal question of whether the contract for European support (and the Court will assume a contract for this exercise) is a "hybrid" contract—to which the UCC applies, or a separate contract for services—to which the UCC does not. *McCarthy Well Co. v. St. Peter Creamery, Inc.*, 410 N.W.2d 312, 315 (Minn. 1987). In a hybrid contract (a contract that involves goods and services), Minnesota courts use the "predominant factor" test to decide whether the essence of the contract is primarily a sale of goods or the provision of services. *Valley Farmers' Elevator v. Lindsay Bros. Co.*, 398 N.W.2d 553, 556 (Minn. 1987), *overruled on other grounds by Hapka v. Paquin Farms,* 458 N.W.2d 683 (Minn. 1990). The "predominant factor" test is "whether the[] predominant factor, the[] thrust, the[] purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom)." *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974).

In this instance, the initial contract is indisputably a contract for goods to which the UCC applies. The question then becomes whether the European support contract is a part of the initial contract, or a separate agreement. If it is a completely separate contract, there is no vi able argument that it is one for goods, or even that it amounts to a hybrid

[19] Indeed, a seasoned law professor would be hard pressed to create a hypothetical involving more contract law issues.

contract. Slidell suggests that by including several terms, such as hourly rate, in the original contract, the European support agreement is really a part of the initial agreement. This argument is difficult to accept. Slidell's CEO, and other key Slidell employees have testified that the European field support agreement was to be separate from the initial contract. (McGregor Aff. ¶ 8 at Tab 7 to Smith Aff.; Williams depo. 197-201 at Tab 23 to Smith Aff.) Slidell emphasizes that the European support agreement was initially slated to be included in the original agreement, but because of concerns raised by Millennium's individual plants, is was not included. There is evidence in the record indicating that both parties contemplated adding the European field support either as a Change Order, or as a separate agreement.

An executed Change Order would clearly be governed by the UCC.[20] In this case, however, the evidence suggests that the European field support agreement was proceeding as a separate contract. This separate contract was one for services, and as such is governed by common law. Assuming the Court finds that the parties reached an oral agreement on the contract for European support services, there is simply no way to understand that oral contract as coming under the original contract, and therefore the (assumed) oral agreement would be governed by common law. Slidell suggests that the European support agreement was separate only because Millennium's plants, for financial reasons, wanted it to be separate. Slidell's assertion may be true, but it is irrelevant; the Court's inquiry does not involve motives, instead the proper inquiry is

[20] The Court also notes that "a contract subject to the statute of frauds cannot be modified orally." *Rooney v. Dayton-Hudson Corp.*, 246 N.W.2d 170, 175 (Minn. 1976).

simply whether the European contract was a separate contract. There is no question that, if a contract indeed existed, it was separate from the original agreement. Because the contract was one for services, as opposed to the sale of goods, the UCC does not apply. Applying principles of Minnesota common law, the Court therefore turns to a question of whether the parties reached an agreement—either oral or written—enforceable by the Court.

**b. Agreement to Agree**

Slidell has pointed to no written agreement embodying what can be considered a final agreement or contract for European field support. Drafts were exchanged, terms were negotiated, but there is no reasonable interpretation of any of these drafts as final. Under Minnesota law, "[n]o contract exists 'where two parties consider the details of a proposed agreement, perhaps settling them one by one, with the understanding during this process that the agreement is to be embodied in a formal written document and that neither party is to be bound until he executes the document.'" *Richie Co., LLP. v. Lyndon Ins. Group, Inc.*, 316 F.3d 758, 761 (8th Cir. 2003) (quoting *Hansen v. Phillips Beverage Co., et al.*, 487 N.W.2d 925, 927 (Minn. Ct. App. 1992)). Although the drafts exchanged are more persuasive than, for example, a letter of intent would be, the drafts evidence an intent to put the final agreement in writing. As such, the Court cannot find that the parties reached an agreement on European field support based on the partial writings containing terms that it is relatively clear were not final. There is simply no written agreement for the Court to enforce.

**c. Statute of Frauds**

Because there is no written contract, the Court considers Slidell's suggestion that the agreement reached was an oral agreement for field support services for 18 months. Millennium disputes that the parties ever reached an oral agreement, and further suggests that even if Slidell could establish this purported oral contract, the statute of frauds would bar its enforcement. Minn. Stat. § 513.01 (providing in pertinent part "No action shall be maintained . . . upon any agreement, unless such agreement, or some note or memorandum thereof, expressing the consideration, is in writing, and subscribed by the party charged therewith: (1) Every agreement that by its terms is not to be performed within one year from the making thereof."); *Worwa v. Solz Enterprises, Inc.*, 238 N.W.2d 628, 631 (Minn. 1976) (oral contract that could not be performed within one year was unenforceable because of the statute of frauds). When addressing this question, the Court notes the important distinction between the statute of frauds' writing requirement and the issue of whether a contract exists. *Simplex Supplies, Inc. v. Abhe & Svoboda, Inc.*, 586 N.W.2d 797, 800 (Minn. Ct. App. 1998). Oral contracts are not void or unenforceable, and "[t]he writing required by the statute 'is not the contract, but only the written evidence of it.'" *Id.* (quoting *Union Hay Co. v. Des Moines Flour & Feed Co.*, 198 N.W. 312, 313 (Minn. 1924) (additional citations omitted).

In this case, Slidell points as evidence of the agreement to terms in the parties' never-executed drafts of potential European field support contracts. These discarded drafts do not constitute adequate "writing" to satisfy the statute; the writings evidence negotiations, and perhaps confirm terms to which the parties did not agree, but the writings do not "demonstrate that a contract [] has been made." *Casazza v. Kiser*, 313

F.3d 414, 419 (8th Cir. 2002) (addressing statute of frauds writing requirement in UCC case).

Slightly more persuasive are the suggestions from Millennium employees that Millennium "would commit to an 18-month contract or hiring of a technical field support person . . ." (Brewer Aff. at 57, 69 Tab 7 to the Post Aff.), and evidence that Millennium agreed to work on getting something in writing. (J. McGregor depo. at 203, Tab 14 to Post Aff.; *see also* Ex. 316, E-mail from Mark Ramsay at Tab 67 to Post Aff.,; McGregor Aff. at 203 at Tab 14 to Post Aff.) However, even these "writings" are insufficient because they do not identify key terms of the "contract", and these writings, again, do not allow the Court to make out the terms of the contract. A contract—oral or otherwise—does not exist unless the parties have agreed "with reasonable certainty about the same thing and on the same terms." *Peters v. Mut. Ben. Life Ins. Co.*, 420 N.W.2d 908, 914 (Minn. App. 1988); *see also Jensen v. Taco John's Int'l, Inc.*, 110 F.3d 525, 527 (8th Cir. 1997) (applying Minnesota law for proposition that an oral contract, to be enforceable, requires reasonably certain proof of parties' intent on fundamental terms). Slidell has not identified writings that would allow the court to determine that the parties agreed about the same thing and on the same terms.

**d. Equitable Estoppel and Promissory Estoppel**

The statute of frauds is intended to promote honesty and fair dealing. *Lunning v. Land O'Lakes*, 303 N.W.2d 452, 457 (Minn. 1980) (citing *Alamoe Realty Co. v. Mutual Trust Life Ins. Co.*, 278 N.W. 902 (1938)). When an application of the statute will protect, rather than prevent, a fraud, "the doctrine of equitable estoppel may limit [its]

application." *Id.* (citing *Roberts v. Friedell*, 15 N.W.2d 496 (Minn. 1944)). Under the laws of Minnesota, equitable estoppel is available when:

1. There has been a misrepresentation of a material fact;
2. The party to be estopped knew or should have known that the representation was false;
3. The party to be estopped intended that the representation be acted upon;
4. The party asserting equitable estoppel lacked knowledge of the true facts; and
5. The party asserting the estoppel did, in fact, rely upon the misrepresentation to his or her detriment.

*Transamerica Ins. Group v. Paul,* 267 N.W.2d 180, 183 (Minn. 1978). *See also Lunning*, 303 N.W.2d at 457 (citing 3 J. Pomeroy, A Treatise on Equity Jurisprudence § 805 (5th ed. 1941)); *see also W.H. Barber Co. v. McNamara-Vivant Contracting Co.*, 293 N.W.2d 351, 357 (Minn. 1979).

In this case, the doctrine of equitable estoppel is inapposite, because the Court has determined that no contract was formed as to the European field support. This conclusion, however, does not preclude the application of the doctrine of promissory estoppel. Promissory estoppel "is an equitable remedy [that] implies a contract in law where none exists in fact." *Waldor Pump & Equipment Co. v. Envirex, Inc.*, Civ. No. 92-702, 1993 U.S. Dist. LEXIS 13315 at *37 (D. Minn. May 12, 1993). *See Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn. 1981). In this case, promissory estoppel, as opposed to equitable estoppel, appears to be the appropriate doctrine, given the Court's determination that no contract existed for the European field support.

Slidell makes a separate argument that it can recover pursuant to the doctrine of promissory estoppel. Under the doctrine of promissory estoppel, a clear and definite promise, which is expected and intended to induce definite action by the promisee, and which does induce that action, is binding if justice requires enforcement of the promise. *Olson v. Synergistic Tech. Bus. Sys., Inc.*, 628 N.W.2d 142, 152 (Minn. 2001); *Dallum v. Farmers Union Cent. Exchange, Inc.*, 462 N.W.2d 608, 612 (Minn. Ct. App. 1990).

Slidell argues that Millennium repeatedly promised it would reduce its oral promises to writing. According to the "Restatement approach" "'promissory estoppel will defeat the statute of frauds **only** when the promise relied upon is a promise to reduce the contract to writing.'" *Casazza v. Kiser*, 313 F.3d 414, 421 (8th Cir. 2002) (emphasis added) (quoting *Del Hayes & Sons, Inc. v. Mitchell*, 230 N.W.2d 588, 593-94 (Minn. 1975)). It is not clear, however, that Minnesota courts would endorse the Restatement view. The Minnesota Supreme Court, in *Del Hayes & Sons, Inc. v. Mitchell*, 230 N.W.2d 588 (Minn. 1975), discussed three approaches to determining whether promissory estoppel can work to remove an oral contract from the statute of frauds. The first is the "Restatement approach" described above. Another is a wholesale rejection of promissory estoppel to remove an oral contract from the statute of frauds. *Casazza*, 313 F.3d at 421 (citations omitted). The third is a more relaxed approach that allows an oral promise to satisfy the statute of frauds "'where such detrimental reliance is of such a character and magnitude that refusal to enforce the contract would permit one party to perpetrate a fraud." *Id.* (quoting *Del Hayes*, 230 N.W.2d at 594). Under this third approach, there must be unconscionable conduct, and merely refusing to perform an oral agreement is insufficient. *Id.* (citations omitted).

The Minnesota Supreme Court did not endorse any of these views, instead, the Court held that in that particular case, promissory estoppel was not established under any of the approaches. *Id.* at 422 (citing *Del Hayes*, 230 N.W.2d at 594). The Minnesota Supreme Court has at least implicitly rejected the most restrictive view. *Berg v. Carlstrom*, 347 N.W.2d 809, 812 (Minn. 1984) ("An agreement may be taken out of the statute of frauds . . . by application of the doctrines of promissory or equitable estoppel."). The Court, therefore, will discuss whether Slidell has pointed to admissible evidence that would allow a reasonable fact-finder to determine that either the Restatement test or the least restrictive test has been met.

Slidell suggests that Millennium employees promised to put the European field support agreement in writing. Slidell points to evidence that, when viewed in the light most favorable to Slidell, can be construed as supporting this assertion. Slidell also suggests that its detrimental reliance on Millennium's promises were of such a character and magnitude that refusal to enforce the promises would permit Millennium to perpetuate a fraud.

Slidell points to a group of (alleged) promises that, if credited by a fact finder, would suffice to establish promissory estoppel. "The trier of fact is in the best position to judge whether oral promises were made, what the mutual understanding of the parties was, and whether the promisor's benefits were merely incidental." *Mill & Elevator Mut. Ins. Co. v. Barzen*, 553 N.W.2d 446, 451 (Minn. Ct. App. 1996) (citation omitted). Similarly, the reasonableness of a promisee's reliance on a promise is a question of fact for the jury. *Norwest Bank Minnesota, N.A. v. Midwestern Machinery Co.*, 481 N.W.2d 875, 880 (Minn. Ct. App. 1992).

Finally, the Court cannot credit Millennium's affirmative defenses of frustration of purpose and impracticability at this time. Both defenses require that the party asserting the defense not be at fault for causing the frustration or impracticability. Because the Court does not grant Millennium's motion for summary judgment on the underlying breach of contract claim, these defenses do not entitle Millennium to summary judgment.

**4. Quantum meruit**

Slidell indicates that a party can bring a claim for quantum meruit even if there is an express contract if the quantum meruit damages are for work outside the underlying contract. The basis of a recovery in quantum meruit is that "the defendant has received a benefit from plaintiff which it is unjust for [the defendant] to retain without paying for it." *Ylijarvi v. Brockphaler*, 7 N.W.2d 314, 319 (Minn. 1942); *see Frankson v. Design Space Int'l*, 394 N.W.2d 140, 146 (Minn. 1986) (allowing recovery in quantum meruit where "There was not a full agreement concerning compensation between [plaintiff] and [defendant], and there was, needless to say, much confusion concerning details of the compensation arrangements. For these reasons [plaintiff] should recover the reasonable value of his services in quantum meruit."); *National Farmers Union Prop. & Cas. Co. v. Fuel Recovery Co.*, 432 N.W.2d 788, 792 (Minn. Ct. App. 1988) (affirming arbitration award in quantum meruit for work performed after written contract was discharged by a supervening event).

It appears that the only arguable benefit Millennium received was the work Slidell performed on the supervisory system. Although Millennium suggests that Change Order No. 5 precludes any recovery under quantum meruit, Slidell argues that it never agreed to

Change Order No. 5. While it is true that a claim for quantum meruit cannot be pursued for work that was the subject of a written contract, it is not clear that is the case with regard to the purportedly extra-contractual work performed on the supervisory system. Assuming then that Slidell's claim for quantum meruit involves the supervisory system, Slidell is entitled to proceed on that claim.

## IV. MOTION TO STRIKE

After oral argument, Slidell submitted a one-page letter along with a supplemental affidavit of Jeffrey W. Post. Three exhibits were attached to the affidavit, including deposition exhibit 809 on which Millennium relied during oral argument. Millennium moved to strike the letter and attached exhibits, arguing the letter was an impermissible sur-reply, and that the letter exceeds the page limit provided to the parties for summary judgment. Millennium also argued that the letter was improper and impermissible in that it came after the close of the summary judgment argument. Slidell suggests that the argument concerning deposition exhibit 809 was not raised until the end of Millennium's oral argument. Neither a reply brief nor oral argument is the appropriate time to raise new facts or arguments. Slidell's very short letter pointing out those "new" facts or arguments is not so improper as to warrant striking the letter. Millennium's motion to strike is therefore denied.

This case will be placed on the Court's next trial calendar.

**ORDER**

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for partial summary judgment and other relief [Docket No. 123] is **GRANTED in part and DENIED in part as follows.**

   a. Plaintiff's motion is granted as to Counts V (equitable lien) and VI (constructive trust) of defendant's first amended answer and counterclaim [Docket No. 58]. Counts V and VI of defendant's first amended answer and counterclaim are **DISMISSED WITH PREJUDICE**;

   b. Plaintiff's motion is **DENIED** in all other respects.

2. Defendant's motion for partial summary judgment [Docket No. 110] is **GRANTED in part and DENIED in part as follows:**

   a. Defendant's motion is granted as to Slidell's claim labeled "Equitable Estoppel," ¶ B, § II of plaintiff's Complaint [Docket No. 1]; Slidell's claim labeled "Equitable Estoppel" is **DISMISSED WITH PREJUDICE;**

   b. Defendant's motion is **DENIED** in all other respects.

3. Millennium's Motion to Strike plaintiff's supplemental briefing and argument [Docket No. 135] is **DENIED**.

**IT IS FURTHER HEREBY ORDERED** that Count IV (unjust enrichment) of defendant's first amended answer and counterclaim [Docket No. 58] is **DISMISSED WITH PREJUDICE**.

DATED: June 28, 2004
at Minneapolis, Minnesota.

s/ John R. Tunheim
JOHN R. TUNHEIM
United States District Judge