**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| Slidell, Inc., | ) | Court File No. 02-CV-213 (JRT/FLN) |
| | ) | |
| Plaintiff and Counterdefendant, | ) | |
| | ) | |
| v. | ) | **MILLENNIUM INORGANIC** |
| | ) | **CHEMICALS INC.'S** |
| Millennium Inorganic Chemicals Inc., | ) | **STATEMENT OF THE CASE** |
| | ) | |
| Defendant and Counterclaimant. | ) | |

Pursuant to Local Rule 39.1(b)(1)(A) and Paragraph 1(A) of the Court's June 28, 2004, Memorandum from the Chambers of Judge John R. Tunheim re Local Rule 39.1 Concerning Pre-Trial Procedures in Civil Jury Trials, Defendant and Counterclaimant Millennium Inorganic Chemicals Inc. (hereinafter "Millennium") hereby submits its Statement of the Case.

## I. BACKGROUND

### A. The Parties.

Millennium is a manufacturer of titanium dioxide ("$TiO_2$"), which is used as pigment in a variety of products, including paint, paper, plastics and other consumer and commercial goods. $TiO_2$ manufactured by Millennium is in the form of a fine, white powder and is most commonly sold to customers in 25-kilogram or 50-pound bags.

Slidell is a manufacturer of automated packaging equipment, including machinery used in the $TiO_2$ industry to bag and palletize $TiO_2$.

**B. Negotiations Leading up to the Contract.**

In the late 1990s, Millennium embarked on a significant overall expansion of its $TiO_2$ production processes worldwide. A portion of that expansion, totaling approximately $35 million in capital costs, was devoted toward upgrading Millennium's $TiO_2$ packaging capacity. As part of that upgrade, Millennium elected to replace existing packaging lines and install new, automated packaging machines in three of its $TiO_2$ plants – Ashtabula, Ohio, Stallingborough, United Kingdom and Le Havre, France.

After investigating several vendors of automated packaging equipment, Millennium ultimately settled on Slidell. In December 1999, after arduous negotiations, Millennium and Slidell executed a Letter of Intent, and Slidell commenced preliminary engineering and technical work on the project while the parties negotiated final contract terms.

**C. The Contract.**

In April, 2000 Millennium and Slidell entered into a written contract in which Slidell agreed to design, manufacture, test, deliver and install seven automated packaging machines (three for Ashtabula, three for Stallingborough, and one for Le Havre) for a contract price of $10.35 million, to be paid by Millennium in installments based on a contractually-defined, milestone-based schedule.

The most pertinent provisions of the contract are as follows:

- Paragraph 20 of the contract provided for a "milestone payment" schedule. Under it, Slidell was to be paid 25% of the contract price when the contract was signed, the next 55% at defined intervals during the fabrication phase; the next 10% at approval of factory acceptance testing, the next 5% upon delivery of the equipment, and the final 5% upon completion of commissioning of the machines.

- Paragraph 20 of the contract also provided for a 12% discount on the cost of certain items. The discount was incorporated into the $10.35 million contract price.

- Paragraph 4 of the contract contained limitations on liability which, generally speaking, limit each side's liability for breach of contract to the contract price. Liability for trade secret violations fall outside that limitation.

- The contract contained no enforceable schedule, deadlines for completion of the work or liquidated damages for untimeliness. The parties, however, contemplated that the work would take approximately 18-20 months to complete.

- Paragraph 19 of the contract established a process by which the parties could agree to amend the contract via change orders.

- Exhibit C of the contract set forth performance requirements (e.g., number of bags per minute) which, both Slidell and Millennium agreed, necessitated the use of a two-stage or "top-off" bagging system. Though Slidell had incorporated the top-off design in other applications, it had never successfully utilized a top-off system in a $TiO_2$ bagging machine before this contract.

- Exhibit A to the contract, the "Proprietary Information Disclosure Agreement," protects the confidentiality of, and limits the use of, Slidell's technical information.

- Exhibit B to the contract, entitled "Operating Systems Software License Agreement," protects the confidentiality of, and limits the use of, Slidell's "Systems Programming," which is defined to include "programming for logic controllers, programmable drives, operating interfaces, supervisory systems, network communications, or other operating systems controls and related software programming."

After the contract was signed, Slidell's work under the contract proceeded slowly. Millennium will prove that Slidell failed to devote enough resources to the project, underestimated the difficulty of designing and building new machines with metric components that had to meet European specifications, managed the project poorly, and delayed bringing key issues to Millennium's attention when they arose.

## D. Wire Colors

After the execution of the Contract, Slidell's work under the Contract proceeded slowly. One issue that impeded progress in 2000 was the issue of wire colors. The Contract specified all wire colors for the packaging equipment, but Slidell later came to believe that the wire colors

specified in the Contract did not fully comply with all applicable US, UK and European wire color standards. Thus, in September 2000, the parties agreed to Change Order No. 3, which changed certain wire colors with no change to the Contract price.

As it turned out, however, Change Order No. 3 did not resolve the issue. Slidell did not realize in September 2000 that it would take several months to procure the wire that was specified by Change Order No. 3. Thus, Slidell suggested that the parties enter into another change order.

On December 11, 2000, the parties agreed to Change Order No. 4, which essentially restored the original wire color specifications, with the provision that certain wires would be tagged to note their purpose. This Change Order included a minor increase in the Contract price of $7,700.

**E. Other Technical Disputes and Production Delays**

During 2000 and early 2001, various other issues arose that caused delays in the production schedule. For example, Slidell needed to procure a European variety of a component called a checkweigher, which is a scale that ensures the proper weight of each bag of $TiO_2$. When Slidell said that it was unaware of how to obtain them, Millennium assisted by asking a European dealer to contact Slidell. A sales representative sent information to Slidell in January 2001, but Slidell inexplicably delayed any action on the matter until December 2001.

In general, Slidell did not devote the appropriate level of project management to the Millennium equipment. Slidell's first Project Manager on the project was a 24-year-old, recent college graduate who had no significant project management experience. She left the company in August 2000. The position remained vacant for four months, during which time problems piled up without being resolved. In January 2001, Slidell assigned the task to another recent college graduate with very little relevant experience. He was unable to move the project

forward. Slidell's failure to devote the necessary resources to the project is shocking given that the Millennium contract was the largest in the company's history.

**F. The Supervisory System**

One issue that was particularly contentious was the supervisory system, a software package that allows data collected in computer chips in the automated packaging machines to be transmitted directly to Millennium's accounting system. The contract contained very general language calling for Slidell to design and build an appropriate supervisory system for all of the machines at a cost of $350,000, which was incorporated into the contract price. Detailed specifications for the supervisory system were to come later.

In the summer of 2000, Millennium gave Slidell a list of functional requirements for a supervisory system. After some discussions, Millennium reduced the functional capabilities and the complexity of the system. In October 2000, Slidell informed Millennium that it would develop a change order to address the increased costs of the upgraded supervisory system. Millennium agreed to consider the change order.

Six months later, on March 6, 2001, Slidell proposed a change order for completing the supervisory system at an additional cost of $1,991,971. Millennium was shocked at the number and immediately balked at signing the proposed change order. Millennium explored alternative arrangements while it continued to discuss the issue with Slidell. On April 27, 2001, Millennium informed Slidell that it need not perform any additional work on the supervisory system. In late May, Millennium made alternative arrangements by engaging the RoviSys Company to complete the supervisory system at a cost of $162,337.

On August 3, 2001, Slidell sent Millennium Change Order No. 5 to delete the supervisory system from Slidell's scope of work with no change in the contract price. Millennium signed Change Order No. 5 and returned it to Slidell. But Slidell contends today that the change order

never became effective because, without informing Millennium, Slidell never signed the change order itself. With the understanding that the supervisory system no longer was within the scope of Slidell's services under the contract, Millennium proceeded to work with the RoviSys Company ("RoviSys") on the supervisory system.

**G. The Discount.**

By the summer of 2001, the project was seriously behind schedule. In July 2001, Millennium's first Project Manager left the company, and Millennium appointed Paul Berwanger, an engineer at the Ashtabula plant with 11 years of experience in manufacturing, to take over that role. Berwanger immediately made it his priority to re-establish a positive, productive relationship with Slidell and do whatever was reasonable and necessary to get the project back on track. Soon after Berwanger took over, all pre-existing disputes concerning technical issues were resolved.

In July and August 2001, however, a new issue arose, which was not technical in nature. Slidell sought to increase the contract price. It did so by suggesting a change order in which Millennium would refund the 12% discount that was incorporated into the original contract price. According to Slidell, the amount of the discount was $1,473,530. Slidell argued that it had incurred higher-than-expected costs and that Millennium should be responsible for them.

Millennium rejected this request on the grounds that any increase in costs was due to Slidell's own errors and inefficiencies and that the basis for the discount – that the "fully assembled major operational system units" would be "identical" – remained unchanged since the execution of the contract. A September 6, 2001 meeting between the parties did not resolve the issue. Millennium disagreed with Slidell's analysis and informed Slidell that it would not agree to refund the 12% discount.

**H. Slidell's Inability to Complete the Equipment**

From September through November, 2001, Slidell performed relatively little work on the project. It continued to present invoices for milestone payments to Millennium, and Millennium continued to pay them. In fact, Millennium began to pay Slidell invoices *ahead of* the progress-based schedule (*i.e.*, prior to Slidell's actual accomplishment of milestones). Millennium provided Slidell with a total of $843,000 in progress payments between September, 2001 and January, 2002. But Slidell performed very little actual work during that period, and the machines remained far from completion.

Rather than finish its work under the contract, Slidell commenced this action against Millennium on January 16, 2002. None of the equipment, or any of their components, ever has been completed and delivered to Millennium. However, Millennium has paid Slidell approximately $8.6 million in milestone progress payments under the contract, out of a total contract price (including change orders) of approximately $11.1 million.

## II. THE PARTIES' CLAIMS AND DEFENSES

Millennium will seek to prove three claims against Slidell.

**A. Millennium's Breach of Contract Claim**

In Counterclaim I, Millennium alleges a claim of breach of contract by Slidell. (Answer & Counterclaim at 9-10.) Because the "predominant purpose" of the parties' contract was the sale of goods, *see Valley Farmers' Elevator v. Lindsey Bros. Co.*, 398 N.W.2d 553, 556 (Minn. 1987), the breach-of-contract claims are governed by the Uniform Commercial Code. *See* Minn. Stat. § 336.2-102; *Minnesota Forest Products, Inc. v. Ligna Machinery, Inc.*, 17 F. Supp. 2d 892, 904 (D. Minn. 1998) (sawmill equipment). The common law of contracts supplements the U.C.C. to the extent it has not been displaced by the U.C.C. *See* Minn. Stat. § 336.1-103.

It is undisputed that Slidell was contractually obligated to build and deliver to

Millennium seven packaging systems. It also is undisputed that Slidell has not delivered to Millennium the packaging machines that are the subject of the contract. The contract did not specify a delivery date. Under the U.C.C., if the time for delivery is not specified, delivery shall occur within a "reasonable time." Minn. Stat. § 336.2-309(1). Though both Slidell and Millennium anticipated that delivery of the equipment would occur within 18 months of the signing of the contract in April, 2000, delivery has not yet occurred. Thus, Slidell has not delivered the equipment within a reasonable time and, therefore, is in breach of the contract.

Slidell will seek to prove that its breach is excused by Millennium's prior breach of contract. That defense is without merit for the reasons stated below in Part II.D.

Slidell's allegation of breach of contract, even if proven, cannot excuse Slidell's failure to deliver the promised equipment to Millennium. In short, Millennium's conduct did not cause Slidell to commit a breach. Slidell's defense is based on facts occurring *not later than September 6, 2001*. After that date, the parties' technical disputes were resolved. It is undisputed that Millennium continued to pay Slidell's invoices between September 2001 and January 2002, when Slidell unilaterally ceased work on the project and commenced this lawsuit. Millennium will prove that Slidell's breach in January 2002 did *not* "result[] directly from" any act or omission of Millennium that might constitute a breach of contract and, therefore, that Slidell cannot prove that defense. *See Carlson Real Estate Co. v. Soltan,* 549 N.W.2d 376, 380 (Minn. Ct. App. 1996).

Furthermore, to the extent Slidell claims that its breach should be excused because Millennium refused to refund the discount, Minnesota law is clear: "'Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered.'" *L.J. McNulty, Inc. v. Village of Newport,* 187 N.W.2d 616, 621 (Minn. 1971) (quoting *United States v. Spearin,* 248

U.S. 132, 136 (1918)). Slidell had a fixed-sum contract for delivery of the equipment. Slidell cannot establish that its failure to deliver the equipment is excused simply because Millennium declined to increase the contract price.

Millennium will prove damages that exceed the contract price of $11.1 million (after change orders), which is the maximum amount of liability permitted by the contract. The most obvious damages are the $8.6 million that Millennium paid to Slidell without receiving any equipment in return. Millennium also is entitled to other out-of-pocket expenditures related to the modernization project. For example, Millennium paid other contractors a sum exceeding $2.5 million to construct a building in Stallingborough for the specific purpose of housing the Slidell equipment.

**B. Millennium's Specific Performance Claim**

In Counterclaim II, Millennium alleges a claim of specific performance. (Answer & Counterclaim at 9-10.) Upon establishing Slidell's liability on Millennium's breach-of-contract claim, Millennium will ask the Court to fashion equitable relief requiring Slidell to complete all its contractual obligations, resulting in the installation of seven Slidell packaging systems at Millennium's facilities in Ohio, the UK, and France. Millennium believes that factual findings relevant to this claim should be submitted to the jury for an advisory verdict.

**C. Millennium's Replevin Claim**

In Counterclaim III, Millennium alleges a claim of replevin. (Answer & Counterclaim at 10.) If the evidence presented at trial indicates that the partially completed equipment would be of value to Millennium, Millennium may ask the Court to order this type of equitable relief as an alternative to other remedies.

**D. Slidell's Breach of Contract Claim**

Count A of Slidell's Complaint alleges that Millennium breached the parties' contract. (Complaint at 9-10.) It appears that Slidell will attempt to prove that Millennium breached the contract in three ways.

First, Slidell will seek to prove that Millennium breached the contract by failing to refund the discount to Slidell. Slidell's justification for this position is that the seven packaging systems were no longer "identical" or "simultaneous." But Millennium will prove that all pieces of equipment were essentially as identical as they were at the time the contract was signed. And although the equipment never was completed and delivered, the anticipated schedule for installation was, at that time, staged at roughly the same intervals as in the original schedule.

Second, Slidell will seek to prove that Millennium breached the contract by taking the supervisory system out of the scope of the project. It was Slidell that prepared Change Order No. 5, which removed the supervisory system from the scope of the contract, and sent it to Millennium, with a signed cover letter promising to sign it after Millennium signed it. Millennium did sign it and returned it to Slidell. Slidell now contends that the change order is not effective because Slidell did not sign it. But Slidell committed to the terms of the change order in writing and promised to sign it if Millennium signed it. Thus, the change order is binding on Slidell. In addition, the change order did not result in any detriment to Slidell and, thus, is effective even without a Slidell signature; it merely relieved Slidell of its obligation to perform part of the contract without reducing the contract price. Furthermore, the document is effective as Millennium's written waiver of its right to receive a supervisory system from Slidell, pursuant to Paragraph 17 of the contract.

If Slidell feels aggrieved because it did not receive additional compensation from Millennium for its work on the supervisory system, it has only itself to blame. Slidell worked on

the supervisory system for six months before proposing a change order in the amount of approximately $2 million, which was far beyond the range of reasonableness. Slidell has no basis for proving a breach of contract with respect to the supervisory system. Millennium paid Slidell all the money due under the contract, and the parties never agreed to a change order to increase the dollar amount allocated to the supervisory system.

Third, Slidell will seek to prove that Millennium breached the contract by "interfering with and unjustifiably hindering Slidell's performance." (Complaint, at 9, ¶ 32(a).) Under Minnesota law, "hindrance" occurs only when a party "renders impossible" the performance of the other party's contractual obligations. *See Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn. 1984) (holding that homeowner committed breach by preventing contractor from entering property to complete performance); *International Travel Arrangers v. NWA, Inc.*, 991 F.2d 1389, 1405 (8th Cir. 1993) (approving jury instructions using term "preventing"); *see also Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 453 (7th Cir. 1982) (Posner, J.) (holding that breach "is excused if the promisee's hindrance or failure to cooperate *prevented* the promisor from performing the contract" (emphasis added)); Richard A. Lord, 13 *Williston on Contracts* § 39:9, at 540 (2000) (stating that "hindrance" does not occur when something merely "makes performance more difficult"). Millennium's actions did not prevent Slidell from completing the manufacture of the equipment, and Millennium's conduct was not "unjustifiabl[e]." Also, Slidell cannot prove the required "causal link" between Millennium's alleged breach and its own non-performance. *LaSociete Generale Immobiliere v. Minneapolis Community Devel. Agency*, 44 F.3d 629, 638 (8th Cir. 1994).

In any event, Slidell will be unable to prove facts constituting hindrance. Its evidence consists of superficial allegations that Millennium failed to make specifications on a timely basis, failed to make timely payments to Slidell, wrongfully made extra-contractual demands on

Slidell, and wrongfully refused to accept early delivery of some parts of the seven packaging systems. On all these issues, Millennium will prove that Slidell was the party responsible for technical problem and for the failure to resolve them at an appropriate time so as to avoid delay. For example, Millennium will prove that it helped Slidell obtain European checkweigher components by putting Slidell in contact with a UK sales representative but that, due to internal bungling, Slidell somehow failed to take action until nearly a year later. Furthermore, Slidell cannot base a claim on its allegations that Millennium somehow frustrated the proper specification of wire colors because Slidell signed off on Change Orders No. 3 and No. 4. Those change orders preclude Slidell from asserting a claim relating to wire colors.

The maximum amount of damages Slidell could recover on this claim is, by contract, limited to the contract price of approximately $11.1 million. Furthermore, Millennium is entitled to a credit of approximately $8.6 million for the payments it made to Slidell. *See* Minn. Stat. § 336.2-718(3)(a); *see also Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 656 (7th Cir. 1998); *Madsen v. Murrey & Sons Co., Inc.*, 743 P.2d 1212, 1216 (Utah 1987); *Lewin Chevrolet-Geo-Oldsmobile v. Bender*, 695 N.Y.S.2d 425, 427 (N.Y. App. Div. 1999). Accordingly, Millennium's maximum contract liability to Slidell is approximately $2.5 million.

**E. Slidell's Promissory Estoppel Claim**

In Count B, Slidell alleged a claim of promissory estoppel to impose liability on Millennium for the expenditures Slidell made when preparing to provide European field support to Millennium. (Complaint at 10.)

This claim is without merit because Minnesota's statute of frauds bars the claim. Slidell cannot circumvent the statute of frauds with an oral agreement unless its "detrimental reliance is of such a character and magnitude that refusal to enforce the contract would permit [Millennium] to perpetuate a fraud." *Casazza v. Kiser*, 313 F.3d 414, 421-22 (8th Cir. 2002) (quoting *Del*

*Hayes & Sons, Inc. v. Mitchell*, 230 N.W.2d 588, 593-94 (Minn. 1975)). Slidell cannot prove that Millennium's conduct was fraudulent. *See Pako Corp. v. Citytrust*, 109 B.R. 368, 382 (D. Minn. 1989) (holding that refusal to perform under an oral agreement is not "unconscionable conduct . . . nor anything remotely resembling fraud"); *Del Hayes & Sons*, 230 N.W.2d at 594 ("a mere refusal to perform an oral agreement, unaccompanied by unconscionable conduct, however, is not such a fraud as will justify disregarding the statute [of frauds]").

Even if Slidell were to establish an actionable promise, Slidell's damages would be limited to the amounts expended by Slidell in "reasonable reliance" on that promise. Millennium will prove that Slidell intended to expand into Europe long *before* Millennium's alleged promise such that its expansion was not induced by Millennium. Millennium also will prove that the vast majority of Slidell's European expenses were incurred *after* Millennium informed Slidell that it would *not* agree to retain Slidell for long-term European field support. Slidell did not formally incorporate its Netherlands-based subsidiary, Slidell B.V., until December 1, 2000, which was several months after it knew that Millennium would not enter into an agreement for European field support. Furthermore, the evidence will show that most, if not all, of the personnel hired by Slidell for its European operations were sales and marketing employees, not technical personnel qualified to provide support on the equipment that was to be delivered to Millennium's European facilities.

**F. Slidell's Confidentiality / Non-Disclosure / Trade Secrets Claim**

In Count D, Slidell alleges that Millennium breached contractual confidentiality and non-disclosure obligations and violated the Minnesota Uniform Trade Secrets Act ("MUTSA"), Minn. Stat. § 325C.01 *et seq.*, by the manner in which it handled proprietary information belonging to Slidell. (Complaint at 11.) It appears that this claim has two parts. First, Slidell will attempt to prove that Millennium wrongfully transferred Slidell's proprietary material to

RoviSys. Second, Slidell will attempt to prove that Millennium used Slidell's trade secrets to enhance the performance of Millennium's existing manufacturing equipment.

Millennium denies liability on both parts of the claim. As an initial matter, Slidell's MUTSA claim is not viable. In Paragraphs 11 and 12 of the contract, the parties expressly agreed that Exhibits A, which applies to Slidell's technical information, and Exhibit B, which applies to Slidell's supervisory system software, "shall exclusively govern" the confidentiality and use of the matter protected by those two exhibits to the contract. (Contract, at 5.) Thus, Slidell is barred from asserting a claim under MUTSA for any conduct by Millennium that is governed by Exhibit A or Exhibit B to the contract. *See, e.g.*, *Independent Consol. Sch. Dist. No. 24 v. Carlstrom*, 151 N.W.2d 784, 786 (Minn. 1967) (parties may contract for exclusive remedies, which are binding in event of breach); *Continental Grain Co. v. Fegles Constr. Co., Inc.*, 480 F.2d 793, 796 (8th Cir. 1973) (same).

**1. Transfer to RoviSys**

Slidell alleges that Millennium wrongfully transferred to RoviSys Slidell's general arrangement drawings, flow diagrams, process control drawings, lay-out drawings, and other related drawings. As a result, Slidell claims, RoviSys now is in a position to compete against Slidell for sales, service and support of Slidell's technologies. This claim implicates Exhibit A to the contract; because Since Slidell does not contend that Millennium transferred "systems programming" to RoviSys, Exhibit B to the contract is not implicated.

Slidell will introduce evidence that certain drawings it prepared were sent to RoviSys. But the evidence also will show that those drawings were not proprietary information or "trade secrets," were transferred with Slidell's knowledge and consent, and were transferred to RoviSys in furtherance of RoviSys's work on the supervisory system for the Slidell packaging equipment. Furthermore, RoviSys and Millennium entered into a written confidentiality agreement in which

RoviSys expressly agreed to keep confidential all information disclosed by Millennium. Further still, RoviSys signed Slidell's standard non-disclosure agreement; Slidell later refused to sign it without explanation.

In any event, even if Slidell were to prove that Millennium's conduct violated Exhibit A (or Exhibit B or the MUTSA), Slidell has not sustained any damages arising from that violation. Millennium will prove that RoviSys never disclosed Slidell's proprietary information to any other person and never used it on any project other than the supervisory system for the equipment that Slidell was building for Millennium. Likewise, Millennium will prove that RoviSys never has been, and never will be, a competitor of Slidell's. Thus, Slidell has not been harmed in any way by Millennium's transfers of information to RoviSys and will not be harmed in the future. Any evidence to the contrary is mere speculation.

**2. Alleged Misuse by Millennium**

In the second part of its confidentiality / non-disclosure / trade secrets claim, Slidell apparently will seek to prove that Millennium experienced cost savings and efficiency gains in its manufacturing process through the improper use of Slidell's proprietary information. Slidell claims that since Millennium has saved itself $3.5 million per year at its Ashtabula plant, Slidell should recover damages for Millennium's unjust enrichment at *all* of Millennium's nine plants for a five- or ten-year period.

As a procedural matter, Slidell should not be permitted to pursue this claim because it has not been pleaded. Slidell's Complaint makes no reference whatsoever to these facts. Count D alleges only that Millennium used Slidell's alleged trade secrets "to its advantage to determine project status and pricing issues, with resulted in Slidell having to pay higher component prices" and "by using it to source portions of the contract scope out to Slidell's competitors." (Complaint, at 11, ¶ 49.) Furthermore, Slidell did not disclose any facts relevant to this issue

during the discovery period.

Nonetheless, on the merits, this part of Slidell's claim is wholly without merit. The supposed "smoking gun" is an article that Millennium's Project Manager, Paul Berwanger, published in *Control* magazine, an industry publication, in January 2003. Mr. Berwanger's article described cost savings at Millennium's Ashtabula plant that were realized when outside consultants conducted "loop audits" that identified inefficiencies in certain steps of the $TiO_2$ production process. Slidell claims that the efficiencies described by Mr. Berwanger were the result of Millennium's alleged misuse of Slidell's proprietary information.

This argument is sheer fantasy. There is no connection whatsoever between Slidell's proprietary information and the subject of Mr. Berwanger's article. Other than vague generalities, Slidell cannot identify precisely what information Millennium allegedly misappropriated or how it was used, and Slidell does not have an expert witness who can speak to this subject.

Millennium's witnesses will emphatically deny that Millennium made any use of Slidell's proprietary information to achieve production efficiencies and cost savings. To show the impossibility of Slidell's theory, Mr. Berwanger will testify that the loop audits mentioned in his article were conducted by outside consultants, not by him or any other Millennium employee. He also will testify that those loop audits occurred in 1999 and 2000, before Slidell ever communicated its proprietary information to Millennium. And Mr. Berwanger will testify that the loop audits occurred before he became involved in the Slidell project. Mr. Berwanger's testimony, and the testimony of other Millennium witnesses, will demonstrate the specious nature of this claim.

**G. Slidell's Quantum Meruit Claim**

Count C of Slidell's Complaint alleges a claim of quantum meruit. (Complaint, at 10-11.) In its ruling on the parties' summary judgment motions, the Court narrowed this claim to the extra-contractual work that Slidell purportedly performed on the supervisory system. Millennium will prove that it received no benefit whatsoever from Slidell's work on the supervisory system because the Slidell equipment never was completed and installed and because Millennium never made use of Slidell's work on the supervisory system in any other way.

## III. LENGTH OF TRIAL

Slidell's counsel has indicated that Slidell will require approximately two weeks to put in its case. Millennium estimates that it will require approximately two to three weeks to put in its case. Thus, it appears that approximately five weeks will be necessary to submit the case to the jury.

DATE: October 4, 2004

HALLELAND LEWIS NILAN
SIPKINS & JOHNSON, P.A.

By s/ Matthew E. Johnson________________________
Michael T. Nilan Reg. No. 79224
Scott A. Smith Reg. No. 174026
Matthew E. Johnson Reg. No. 235945
Amanda M. Cialkowski Reg. No. 306514
220 South Sixth Street, Suite 600
Minneapolis, Minnesota 55402
Telephone: (612) 338-1838
Fax: (612) 338-7858

*Attorneys for Defendant and Counter-claimant Millennium Inorganic Chemicals Inc.*