**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Slidell, Inc.,<br><br>Plaintiff and Counterdefendant,<br><br>v.<br><br>Millennium Inorganic Chemicals Inc.,<br><br>Defendant and Counterclaimant. | Court File No. 02-CV-213 (JRT/FLN)<br><br>**MILLENNIUM'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A DIRECTED VERDICT** |

## INTRODUCTION

Millennium is entitled to a directed verdict on several of Slidell's claims.

First, Slidell's claim for promissory estoppel fails because there is insufficient evidence for the jury to conclude that: (1) a clear and definite promise was made; (2) Slidell's reliance on that promise was reasonable; and (3) Millennium engaged in unconscionable conduct worthy of overcoming the statute of frauds.

Second, Slidell's claims that Millennium wrongfully gave away proprietary information of Slidell's in violation of the parties' contract and the Minnesota Trade Secrets Act fail because Slidell consented to the disclosure of the information. Additionally, Slidell's claims under the Minnesota Trade Secrets Act as they relate to the "OEE" and Ethernet connectivity drawings fail for the additional reason that neither constitutes a trade secret.

Third, Slidell's claims for damages related to wire-color issues fail because the parties executed valid change orders to resolve these issues. Accordingly, these change order waive Slidell's right to claim any damages related to any problems related to the wire colors arising prior to the execution of the change orders. Thus, Millennium is entitled to a directed verdict on all of these claims.

## FACTS

### I. Slidell's Claim for Promissory Estoppel

Slidell argues that Millennium promised that it would contract with Slidell for European support of the Slidell machinery. Under the terms of the parties' contract, however, all change orders had to be in writing. (Trial Exhibit 12 at p. 7.) Slidell admits that while there were discussions about putting such an agreement into writing, no written agreement was ever entered into. (Tr. Transcr. 500:5-8; 502:5-6; 893:10-14; 895:11-13.)

Slidell also admits that Millennium informed Slidell that a high-level Millennium executive, Tim Dowdle, refused to approve a European support contract with Slidell. (*Id.* at 502:7-16.) Shortly after Mr. Dowdle's rejection of European field support, Mike Brewer, a Millennium employee, allegedly promised to set up a "blanket [purchase order or] PO and SAP based on the terms and rates in the contract" under which Slidell would provide Millennium with European support. (*Id.* at 514:5-15.) According to Slidell's owner Jim McGregor, after allegedly promising to set up a blanket purchase order Mr. Brewer then "promised to get [Mr. McGregor] a copy [of the PO.]" (*Id.* at 515:21-23.) Mr. McGregor testified that this was "[t]he normal process[:] you open a PO, you get a copy of the PO." (*Id.* at 515:21-23.) According to Mr. McGregor, he never received a copy of this blanket PO. (*Id.* at 514:24-25.) Despite never seeing or obtaining a copy of the purchase order and despite the inconsistent messages it allegedly received, Slidell proceeded in setting up an entire European operation.

## II. Slidell's Claims for Misappropriation and Breach of Contract[1]

Slidell also argues that Millennium wrongfully obtained and gave away Slidell's proprietary information. In this regard, it states a cause of action under the Minnesota Trade Secrets Act as well as a claim for breach of contract citing Exhibits A and B of the parties' contract which are entitled "Proprietary Information Disclosure Agreement" (Tr. Exhibit A) and "Operating Systems Software License Agreement" (Tr. Exhibit B).

### A. Slidell Consents to and Participates in the Disclosure of Information to Rovisys.

Slidell argues that Millennium transferred documents to a third-party vendor, Rovisys, in violation of the parties' contract as well as the Minnesota Trade Secrets Act. Rovisys, however, signed Slidell's standard confidentiality agreement. (Tr. Transcr. 822:18-823:2; 1426:1-11.) The signed agreement was returned to Slidell. (*Id*. at 822:18-823:2.) Slidell never gave either Millennium or Rovisys notice that it did not intend to sign the agreement. (*Id*. at 823:3-19.)

In addition, Slidell entertained Rovisys employees at its facilities. (*Id*. at 825:5-13.) Slidell itself shared information with Rovisys. (*Id*. at 799:2-800:6; 808:17-809:6.) Although Slidell now claims that some of this information was bogus, Slidell never informed Millennium or Rovisys that the information Slidell was providing was fake. (*Id*. at 1156:9-1157:20.) Slidell was also aware that Rovisys had information from Slidell in its possession, but at no point did Slidell object to this or to Millennium exchanging information with Rovisys. (*Id*. at 827:9-828:13; 1118:15-19; 1126:3-15; 1128:16-20.)

[1] By moving for a directed verdict on Slidell's trade secret claims, Millennium does not intend to waive its arguments that: (1) the contract between the parties provides Slidell with the exclusive remedy for the disclosure of any confidential information and that Slidell's claim under the Minnesota Trade Secrets Act is therefore barred and (2) Slidell's trade secret claim with respect to the OEE is barred because Slidell neglected to plead this claim in its Complaint.

**B. The OEE**

One of the "trade secrets" Slidell argues that Millennium misappropriated was the "Overall Equipment Effectiveness Performance Guideline" or "OEE." (*See* Tr. Transcr. 380:11-13.) According to Mr. McGregor's testimony at trial, the OEE is a "benchmarking measurement tool," a way to evaluate the entire packaging line for how it is performing." (*Id.* at 380:14-17.) Mr. McGregor admitted at trial that the OEE was not a concept unique to Slidell. (*Id.* 734:8-11; 1135:21-24.) Rather, Slidell had made the concept unique by taking a "general concept" and applying it to a packaging line. (*Id.* at 734:13-14.)

Mr. McGregor testified that the OEE is defined as "availability times performance times quality." (*Id.* at 380:20-23.) The specifics of these calculations were based upon agreements Slidell reached with Millennium; for example, "availability" is contingent upon "down time," and Millennium and Slidell had to negotiate how to define "down time." (*Id.* at 1139:18-21; 1146:13-16.) Regarding these negotiations, Mr. McGregor testified as follows:

Q: And in order to make this a guarantee which was in your contract, you have to have an agreement with your customer as to how to measure these, don't you?

A: Yes, you do.

Q: You came to an agreement with Millennium, but now you claim that agreement constitutes a trade secret, isn't that true?

A: Yes. Yes, it is.

(*Id.* at 1146:13-20.)

Ultimately, under the terms of the parties' contract, the OEE needed to be 85% or greater as measured in three contractor supervised contiguous run periods of eight hours. (*Id.* at 380:19-

23.) The OEE could be calculated manually or through the supervisory system. (*Id*. at 1147:10-14.) According to Mr. McGregor, an OEE of 85% or greater was Slidell's guarantee to Millennium. (*Id*. at 1136:5-10; 1137:10-22.)

### C. Ethernet Connection Drawings

Slidell also argues that the concept of using Ethernet to hook up panel view screens to the programmable logic controllers ("PLCs") constitutes a trade secret. (*Id*. at 2189:11-20.) Phil Williams, a Slidell employee, testified as follows:

> Q: Is it your testimony, Mr. Williams, that the concept of using Ethernet to hook up panel view screens to PLCs is a trade secret?
>
> A: I would say that the connectivity, functionality of that, yes.

(*Id*.) However, Mr. Williams also noted that Slidell did not invent Ethernet, rather Ethernet "is a common off-the-shelf card item" and that he could "go to Wal-Mart and buy an Ethernet card." (*Id*. at 2187:9-16; 2189:11-20.)

## III. Slidell's Claim for Damages Related to Wire Color Issues

Slidell claims that it is entitled to damages related to issues surrounding the wire coloring for the machinery. Specifically, Slidell argues that it is entitled to damages associated with Millennium's alleged delay in dealing with wire color issues. In addition, Slidell argues that it is entitled to a refund of the discount it gave Millennium for building similar machinery. In this vein, Slidell argues that the changes to the wire color scheme encompassed by the change orders meant to resolve the wire color issues made the discount inapplicable.

The parties' contract contained specific language setting forth the colors of various electrical wires to be incorporated into the American and European machines. (*See* Tr. Exh. 12, Exh. G, Appendix B, ¶ 5.10.5.) Even before the contract was signed however, Slidell recognized

that the colors spelled out in the contract would have to be altered. (Tr. Transcr. 2016:4-12; 2017:6-8.) The parties agreed that the matter was not a pressing concern and could be dealt with later in the performance of Slidell's work under the contract. In June of 2000, the parties turned their attentions to the wire color issue. (*Id*. at 2017:9-12.) For the next several weeks, the parties endeavored to come up with new wire colors that would satisfy the parties' needs and the applicable law. Those efforts culminated for the first time in early September when Millennium and Slidell signed Change Order No. 3. (See Tr. Exh. P 555.)

Unfortunately, after signing Change Order No. 3, Slidell discovered that the new, specified wire colors for the European machinery were only available through special order with a delivery time of approximately three to four months. (Tr. Transcr. 2045:5-9.) The lengthy additional delay that would have resulted caused the parties to once again investigate alternative wire colors, and those investigations and negotiations ultimately led to the parties' agreement and execution of Change Order No. 4 in December of 2000. (*See* Tr. Exh. P 559.)

## ARGUMENT

### I. Standard for Granting a Directed Verdict

Under Rule 50 of the Federal Rules of Civil Procedure, Millennium is entitled to judgment as a matter of law if there is no legally sufficient evidentiary basis for a reasonable jury to find for Slidell on its claims. Fed. R. Civ. P. 50 (a)(1). The Court should grant Millennium a directed verdict if there is no substantial evidence to support a contrary verdict. *See, e.g., Mulholland v. Schneider Service Co., Inc.*, 661 F.2d 708, 711 (8th Cir. 1981); *Hauser v. Equifax, Inc.*, 602 F.2d 811, 814 (8th Cir. 1979). Generally, Slidell, as the non-moving party, is entitled to inferences which may be drawn from the evidence; however, Slidell is not entitled to inferences based upon speculation. *Hauser,* 602 F.2d at 814. Finally, when evidence is so one-

sided as to leave no room for any reasonable difference of opinion as to how the case should be decided, the issue should be decided by the Court as a matter of law rather than submitted to the jury for its determination. *Id*.

## II. Millennium Is Entitled to a Directed Verdict on Slidell's Promissory Estoppel Claim.

To establish a claim for promissory estoppel, Slidell must prove: (1) the existence of a clear and definite promise, (2) which is expected and intended by Millennium to induce definite action by Slidell, (3) which does induce that action, and (4) that injustice can only be avoided by enforcing the promise. *See, e.g., Ruud v. Great Plains Supply, Inc.*, 526 N.W.2d 369, 372 (Minn. 1995). In addition, Slidell's reliance must be "reasonable" in order for it to prevail. *See Nicollet Restoration, Inc. v. City of St. Paul*, 533 N.W.2d 845, 848 (Minn. 1995). Finally, for promissory estoppel to overcome the statute of frauds, as it must here, *see* Summary Judgment Order at 36-37 (June 28, 2004), Slidell must show that Millennium's conduct was unconscionable and that refusal to enforce the contract would permit one party to perpetuate a fraud. *See Meshbesher & Spence, Ltd. v. Sprint Spectrum, L.P.*, 2004 WL 2801590 at **4-5 (D. Minn. 2004). A mere refusal to perform an oral agreement, unaccompanied by unconscionable conduct, is not such a fraud as will justify disregarding the statute of frauds. *Id.* at *4.

Here, Millennium is entitled to a directed verdict on Slidell's promissory estoppel claim because: (1) Mr. Brewer's alleged promise to open up a blanket purchase order was not clear or definite; (2) Slidell's reliance was not reasonable; and (3) Millennium's conduct was not unconscionable and tantamount to fraud.

### A. Millennium's Alleged "Promise" Is Not Clear or Definite.

To establish promissory estoppel, Slidell must show the existence of a clear and definite promise. *See, e.g., Ruud*, 526 N.W.2d at 372. Here, Slidell argues that Mr. Brewer stated that he

would open up a blanket purchase order for European support. (Tr. Transcr. 514:5-:15.) Such a statement is simply too indefinite to meet the requisites for promissory estoppel. The terms and conditions of the alleged promise are essentially nonexistent. Mr. Brewer's alleged statement stating that the terms and conditions would be based upon the parties' prior contract gives no indication whatsoever as to what the alleged promise was. In addition, the parties were contracting for long-term European field support, yet Mr. Brewer's alleged statement makes no representation about the length of time that the purchase order would be in effect for. This one statement by Mr. Brewer is simply not enough to constitute a clear and definite promise for the purpose of establishing promissory estoppel.

**B. Slidell's Reliance Was Not Reasonable.**

In order to establish a claim for promissory estoppel, Slidell must also establish that its reliance was reasonable. *See Nicollet Restoration*, 533 N.W.2d at 848. Whether reliance is reasonable is judged by a subjective, rather than an objective, standard. *See Davidson v. Wilson*, 763 F. Supp. 1470, 1472 (D. Minn. 1991). The capacity and experience of Slidell is therefore relevant in determining whether it acted reasonably. *See id.*

Mr. McGregor testified that Slidell's reliance resulted from Mr. Brewer's alleged promise that he would open up a blanket purchase order for European support. (*See* Tr. Transcr. 514:5-15.) Mr. McGregor also testified, however, that he never received a copy of this purchase order even though it was normal practice to receive one. (*Id.* at 514:24-25; 515:21-23.) In addition, Mr. McGregor testified that he knew that Millennium's executive vice president, Tim Dowdle, had rejected the idea of long-term European support at the time of Mr. Brewer's alleged statements to the contrary. (*Id.* at 502:7-16.) Finally, under the terms of the parties' contract, any change order adding European support needed to be in writing. (*See* Tr. Exh. 12 at p. 7.)

Slidell in fact testified that contract proposals were exchanged, but nothing was ever finalized. (Tr. Transcr. 500:5-8; 502:5-6; 893:10-14; 895:11-13.)

Despite all of this, Slidell went ahead and set up an entire European operation. Slidell's reliance cannot be said to have been reasonable. Mr. McGregor testified that it would have been normal to obtain a copy of the purchase order, and Slidell knew that under the terms of the contract a change order had to be in writing. Yet Slidell continued to set up an entire European operation without ever obtaining or seeing a copy of the alleged promised purchase order and with the knowledge that one of Millennium's highest-level executives had specifically refused to approve a European support contract.

**C. Millennium's Conduct Was Not Unconscionable.**

In order to overcome the statute of frauds, there must be *unconscionable conduct*. *See Meshbesher,* 2004 WL 2801590 at **4-5 (*citing* 3 *Williston on Contracts* § 533A (3d ed.). "Where the entire transaction leading up to the making of the verbal contract is open and free from fraud or false representation, the subsequent failure to carry out that contract cannot of itself constitute an estoppel" worthy of overcoming the statute of frauds. 10 *Williston on Contracts* § 27:17 (4th ed. 2004). In addition, the "mere[] refus[al] to perform an oral agreement is insufficient" to constitute unconscionable conduct and will not overcome the statute of frauds. *See* Summary Judgment Order at 36 (*citing Casazza v. Kiser*, 313 F.3d 414, 421 (8th Cir. 2002)).

Here, Slidell offers no evidence that Millennium acted unconscionably. In fact, Slidell argues only that Millennium refused to execute its performance. The mere refusal to perform, however, is not enough to overcome the statute of frauds. *See Meshbesher,* 2004 WL 2801590 at **4-5. This is true *even if* the refusal to carry out a promise results in hardship to the

complaining party. 10 *Williston on Contracts* § 27:17. To take a case out of the statute of frauds simply because the complaining party has suffered some loss would annul the purpose of the statute. *See id.*

In addition, Slidell has offered nothing to indicate that Millennium's conduct leading up to its alleged promise was fraudulent. Indeed, what would Millennium's motive be for enticing Slidell to set up a European operation and then never using it? Stated simply, Slidell cannot show that Millennium's conduct was unconscionable. Slidell's promissory estoppel claim therefore fails.

Because Slidell has not offered sufficient evidence to establish: (1) that Millennium made a promise that was clear and definite; (2) that Slidell's reliance was reasonable; and (3) that Millennium acted unconscionably, Millennium is entitled to a directed verdict in its favor on Slidell's promissory estoppel claim.

## III. Millennium Is Entitled to a Directed Verdict on Slidell's Misappropriation and Breach of Contract Claims.

Slidell argues that Millennium wrongfully obtained and gave away proprietary information of Slidell's in violation of the parties' contract and the Minnesota Trade Secrets Act. Millennium is entitled to a directed verdict on both Slidell's contract and statutory claim, however, because Slidell consented to the disclosure of the information. Millennium moves for a directed verdict on Slidell's claim under the Minnesota Trade Secret Act as it relates to "the OEE" and the Ethernet connectivity drawings on the additional grounds that neither qualifies as a "trade secret."

### A. Slidell Consented to the Disclosure of Information to Rovisys.

Slidell's claims under both the contract and Minnesota Trade Secrets Act are barred because Slidell consented to the disclosure of the information and thereby waived any

contractual or statutory right it had to object to the disclosure. *See* Minn. Stat. § 325C.01, subd. 3 (party does not wrongfully misappropriate trade secret if complaining party expressly or implicitly consented to the disclosure of the information); *Citizens Natl. Bank of Madelia v. Makato Implement, Inc.*, 427 N.W.2d 23, 27 (Minn. App. 1988) (a right can be waived through consent). Consent can be inferred by "[a]ny conduct … inconsistent with an intention to claim [the right provided by statute or contract]." *Citizens*, 109 N.W.2d at 429 (citations omitted).

First, Slidell itself provided information to Rovisys. (Tr. Transcr. 799:2-800:6, 808:17-809:6.) The fact that it later claimed that some of this information is bogus is irrelevant; neither Millennium nor Rovisys knew that Slidell was forwarding fake information to Rovisys. (*See Id.* at 1156:9-1157:20.) Second, Slidell knew that Rovisys had in its possession Slidell information, yet at no point did Slidell object to the fact that Rovisys had information of Slidell's, nor did it complain to Millennium that Millennium should not be forwarding Slidell's information to Rovisys. (*Id.* at 827:9-828:13, 1118:15-19; 1126:3-15; 1128:16-20.) Third, Slidell had in its possession a confidentiality agreement signed by Rovisys. (*Id.* at 822:18-823:2; 1426:1-11.) At no point did Slidell indicate that it objected to the agreement or that Slidell would not sign the agreement. (*Id.* at 823:3-19.) Finally, Rovisys employees visited Slidell's facilities and, again, at no point did Slidell object to their presence or indicate to Millennium that Rovisys should not be given Slidell information. (*Id.* at 825:5-13.) Slidell consented to and participated in the process of providing Rovisys with Slidell's proprietary information, and its contract and statutory claims must therefore fail.

**B. Slidell Is Estopped From Claiming that Millennium Wrongfully Provided Rovisys With Proprietary Information From Slidell.**

In addition, Slidell is estopped from asserting that Millennium acted wrongfully in providing Rovisys with Slidell information. Estoppel applies if: (1) there has been a

misrepresentation of material fact; (2) the party to be estopped knew the representation was false; (3) the party to be estopped intended the representation to be acted upon; (4) the party asserting estoppel lacked knowledge of the true facts; and (5) the party asserting the estoppel relied upon the misrepresentation to his or her detriment. *Transamerica Ins. Co. v. Intl. Broadcasting Corp.*, 94 F.3d 1204, 1208-09 (8th Cir. 1996).

Millennium made it clear to Slidell that it intended to hire a third party to help develop the supervisory system. (Tr. Transcr. 1091:13 – 1092:1.) Having received a confidentiality agreement that "appear[ed] to be the format" of Slidell's standard agreement (*Id*. at 1426:1 – :8), Millennium had RoviSys sign it and returned the agreement to Slidell. In the cover letter transmitting the agreement, Millennium stated "I hope that this will allow free and open discussions about any supervisory system interfacing questions that come up in the next few months." (*Id*. 1158:18 – 1159:2.) As previously discussed, Slidell never told either Millennium or RoviSys that it was refusing to sign the agreement. (*Id*. at 823:3-:19.) Consequently, Slidell led Millennium to believe it had consent to share certain information with RoviSys.

Moreover, Slidell reinforced that representation by providing Millennium and Rovisys with bogus information. (Tr. Transcr. 1156:9-1157:20.) Slidell knew at the time that the information was false; however, neither Millennium nor Rovisys were aware of the information's falsity. Slidell intended for the information to be relied upon by Millennium and Rovisys in proceeding with the supervisory system. Slidell knew or should have known that Millennium and Rovisys would certainly believe that Slidell, by providing the information, had consented to the exchange of information with Rovisys for the purpose of assisting Rovisys with the supervisory system. Millennium relied on Slidell's conduct by continuing to forward to Rovisys information for use in creating the supervisory system. Millennium's conduct in that

regard is the basis for Slidell's claims that Millennium violated the contract and the Trade Secrets Act. Slidell is therefore estopped from its claims.

### C. Millennium Is Entitled to a Directed Verdict on Slidell's Misappropriation Claim as It Relates to the OEE and Ethernet Connectivity.

Millennium is also entitled to a directed verdict on Slidell's trade secret misappropriation claim because the OEE and Ethernet connectivity drawings are not trade secrets. Under the Minnesota Trade Secrets Act, a "trade secret" "means information, including a formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use[.]" Minn. Stat. § 325C.01, subd. 5. Here, the OEE and Ethernet connectivity drawings are not trade secrets because under Minnesota law, the variation of generally-known concepts cannot constitute trade secrets. Slidell's claims that the OEE is a trade secret additionally fail because: (1) a formula based upon negotiations with and information from Millennium cannot constitute a trade secret; and (2) a warranty as to performance standards cannot constitute a trade secret.

#### *1. The variation of a generally-known concept is not a trade secret.*

In order to constitute a trade secret, the information at issue cannot be generally known or readily ascertainable. *Id*.; *see also Jostens, Inc. v Natl. Computer Systems, Inc.*, 318 N.W.2d 691, 698 (Minn. 1982). In this vein, "[m]ere variations in general processes known in the field which embody no superior advances are not protected." *Jostens*, 318 N.W.2d at 698; *see also Strategic Directions Group, Inc. v. Bristol-Myers Squibb Co.*, 293 F.3d 1062, 1065 (8th Cir. 2002). In addition, the application of a generally known concept to a new industry <u>does</u> <u>not</u> constitute a trade secret. *Jostens,* 318 N.W.2d at 699. This is true even if the transfer into the new industry involves "customization" of the concept. *See id*.

In *Jostens*, the plaintiff took a general concept and applied it to the ring industry. Specifically, the plaintiff used a computerized mold-making system to produce ring molds instead of using skilled artisans to engrave designs into the molds as it previously had done. *Id.* at 694. In that regard, it created a computer system which consisted of three parts: (1) a digitizer or scanner subsystem used for translating positional data from artwork and three-dimensional models into computer-readable magnetic tape; (2) an interactive computer graphics subsystem in which an image was displayed in three dimensions on a screen where it could be manipulated and corrected; and (3) an engraving subsystem where a machine was guided to engrave a design onto a mold. *Id.* The entire system was referred to as a CAD/CAM or "computer-aided design and computer-aided manufacturing" system which the plaintiff argued constituted a trade secret. *Id.*

The Supreme Court of Minnesota disagreed. Specifically, it noted that the idea of a CAD/CAM system was not unique. *Id.* at 699. And further, while the plaintiff may have been the first to employ it in the ring industry, this was irrelevant because the concept was still generally known and readily ascertainable. *Id.* The Supreme Court further noted that the plaintiff's use of general skill and knowledge to gather three generally known systems and get them to perform together to obtain a desired result was not so novel a concept as to constitute a trade secret. *See id.*

Similarly here, Slidell argues that the employment of general concepts to the packaging industry constitute a trade secret. Mr. McGregor admitted at trial that the OEE is a concept generally known. (Tr. Transcr. 734:8-11; 1135:21-24.) As evidence of its uniqueness, he added only that Slidell was the first to apply it to a packaging line. (*Id.* at 734:13-14). Under Minnesota caselaw, this is simply not enough to constitute a trade secret. *See* discussion *supra*.

Mr. McGregor's self-serving statement to the contrary is not enough to avoid a directed verdict in Millennium's favor. *See Wal-Mart Stores, Inc. v. P.O. Market, Inc.*, 66 S.W.3d 620, 634 (Ark. 2002) (In reversing a verdict in favor of the plaintiff in a trade secrets case, the Arkansas Supreme Court concluded that the self-serving testimony of an interested party that a concept was "novel" was not enough to support verdict in favor of plaintiff.).

In addition, Slidell's assertion that the Ethernet connectivity drawings are trade secrets fails for the same reason. Slidell testified that Ethernet is a common, off-the-shelf item that could be purchased at Wal-Mart. (Tr. Transcr. 2187:9-16.) Slidell simply utilized it for the purpose of hooking up the panel view screens to the PLCs. (*Id.* at 2189:11-20.) Under the Supreme Court of Minnesota's reasoning in *Jostens*, the incorporation of a generally-known system into a bigger process is *not* a trade secret. 318 N.W.2d at 699. Therefore, Slidell's argument that Ethernet connectivity drawings are a trade secret fails.

*2. A formula based upon negotiations with and information from Millennium cannot constitute a trade secret*

In addition, to the extent Slidell argues that the OEE in this context was different because its component calculations had to be altered to accommodate Millennium's packaging line, this is insufficient to turn the general concept of the OEE into a trade secret. As discussed *supra*, the mere variation of a general concept for the purpose of applying it in a new context does not create a trade secret. *See Jostens,* 318 N.W.2d at 699.

Further, to the extent the concept was "tweaked," by Mr. McGregor's own testimony, this "tweaking" was dependent upon negotiations with and information from Millennium. (*See* Tr. Transcr. 1139:18-21; 1146:13-16.) In order to constitute a trade secret, however, the concept must be both (1) developed at Slidell's expense and (2) valuable to others. *See* Minn. Stat. § 325C.01, subd. 5; *Surgidev Corp. v. Eye Tech., Inc.*, 648 F. Supp. 661, 688 (D. Minn. 1986)

(discussing Minn. Stat. § 325C.01, subd. 5). The variations in the system created by Slidell were not the result of Slidell's hard work; rather, they were the result of negotiations with and information from Millennium. (*See* Tr. Transcr. 1139:18-21; 1146:13-20.) In addition, because the variation in the concept that occurred was for the purpose of evaluating the machines purchased by Millennium and those machines were customized to meet Millennium's specifications, it is unclear how the this new "novel" concept would have value to anyone else.

*3. A warranty as to performance standards cannot constitute a trade secret.*

Finally, the alleged trade secret OEE is nothing more than a warranty or guarantee that it gave to Millennium. Mr. McGregor testified that the OEE was Slidell's guarantee to Millennium and that the OEE was a method for evaluating the machines overall performance. (Tr. Transcr. 380:14-17; 1136:5-10; 1137:10-22.) Slidell's argument the OEE is a trade secret fails for several reasons.

First, nothing in the plain language of Minnesota Statute § 325C.01 indicates that a warranty or guarantee can constitute a trade secret. *See* Minn. Stat. § 325C.01, subd. 5 (listing as possible trade secrets: a "formula, pattern, compilation, program, device, method, technique, or process"). Second, a concept must have value to others to constitute a trade secret. *See* Minn. Stat. § 325C.01, subd. 5; *Surgidev Corp. v. Eye Tech., Inc.,* 648 F. Supp. 661, 688 (D. Minn. 1986) (discussing Minn. Stat. § 325C.01, subd. 5). Here, the warranty given to Millennium would have no value to others, and thus it cannot constitute a trade secret. Finally, when elaborate tests are necessary to meet the performance standards of customers who contract for customized machinery, a trade secret cannot be found in those tests. *See Ferranti Electric, Inc. v. W.J. Harwood*, 251 N.Y.S.2d 612, 615-16 (N.Y. App. Div. 1964) (finding performance testing not to constitute a trade secret when the tests were necessary to meet the specifications of

customers). For all of these reasons, Millennium is entitled to a directed verdict on Slidell's trade secret misappropriation claim as it relates to the OEE and the Ethernet connectivity drawings.

**IV. Slidell's Claims for Damages Related to Wire Coloring Issues Are Barred Under the Doctrine of Accord and Satisfaction or Waiver.**

Where parties to a contract amend their agreement via a change order or other modification, contractual rights which may have existed prior to the modification, which are inconsistent with the change, must be deemed to be waived or excused. For instance, in *Rapp v. Mountain States Telephone & Telegraph Co.*, 606 P.2d 1189, 1191-92 (Utah 1980), the Supreme Court of Utah stated the rule as follows:

> It is well-settled law that the parties to a contract may, by mutual consent, alter all or any portion of that contract by agreeing upon a modification thereof. *Where such a modification is agreed upon, the terms thereof govern the rights and obligations of the parties under the contract, and any pre-modification contractual rights which conflict with the terms of the contract as modified must be deemed waived or excused.* Where a party's expectations under a contract are frustrated, he may seek recovery from the other party only if his injury is the direct result of a breach of the contract *as modified.* (Emphasis added).

Many courts have expressed the view that a change order to a contact, encompassing changes which are agreed upon by both parties, constitutes an accord and satisfaction as to matters previously in dispute. *See, e.g., Hoffman Construction Co. v. United States*, 7 Ct. Cl. 518, 528-29 (Ct. Cl. 1985) (". . . the issuance of final change orders constitute, in each case, an accord and satisfaction between the parties on the increased costs produced by the change orders"); *Venture Construction Co. v. Great American Mortgage Investors*, 134 Ga. App. 440, 214 S.E.2d 683, 686 (1975) (change order deemed to constitute a binding accord and satisfaction); *J.A. Jones Construction Co. v. Greenbriar Shopping Center*, 332 F. Supp. 1336, 1341-42 (N.D. Ga. 1971) (". . . Change Order Number 154 was a compromise and mutual accord

and satisfaction . . ."); *Stellar Manufacturing Co. v. Tennessee Valley Authority*, 707 F. Supp. 782, 789 (E.D. Pa. 1989) (two change orders constitute an accord and satisfaction barring future claims for compensation due to delays occurring prior to execution of the change orders); *Caven v. American Federal Savings & Loan Assoc. of Colorado*, 837 F.2d 427, 430 (10th Cir. 1988); *Nelson Bros. Const. Co. v. United States*, 1981 WL 20816 (Ct. Cl. 1980).

Pursuant to these authorities, where a party seeks damages for delay or other breach upon conduct that is later encompassed within a change order, the courts have consistently held that the execution of the change order effectively extinguishes the factual basis for the claim. For instance, in *Rapp v. Mountain States Telephone and Telegraph Co.*, *supra*, the parties to a construction contract learned that a particular piece of equipment would not arrive in time to complete the contract on schedule; as a consequence, the parties executed a change order substituting a different piece of equipment for the slow-to-be-delivered one. The parties then learned that the newly-specified piece of equipment was too large for its intended use, and the parties executed a second change order substituting a smaller device. *Rapp*, 606 P.2d at 1192. The effect of those modifications was summarized by the Supreme Court of Utah as follows:

> . . . [T]he change orders constituted valid modifications of the existing contract. Breach of the contract, to the extent that it occurred at all, may not now be assigned to acts or omissions excused by such modifications. Thus, defendant may or may not have been in breach for prescribing the use of the Carrier unit [the original specification] (or plaintiff might or might not have been in breach for failing to make a timely order thereof), but the modification settling upon the [first] substituted . . . excused both performances. Similarly, defendant may or may not have been in breach by prescribing a unit too large for the room that has been designed to house it, but that performance was excused by the further modifications specifying a smaller unit.
>
> Our only concern, then, is whether either party breached the contract by failing to perform according to its terms *as modified*.

606 P.2d at 1192 (emphasis added).

Similarly, in *J.A. Jones Construction Co.*, *supra*, an action involving a paving subcontract at a shopping center, the original paving work was performed by the subcontractor in an unsatisfactory manner. The owner and the general contractor agreed to execute a change order, Change Order 154, by which the necessary repair work would be performed. The court held that the change order terminated any and all prior claims that the paving had not been properly performed:

> Insofar as the paving portion of the prime contract is concerned, Change Order Number 154 was a compromise and mutual accord and satisfaction between Greenbriar [owner] and Jones [general contractor]. . . .
>
> As such, [Change Order Number 154] is immediately binding upon the parties and terminates the prior obligations and prior controversy between them insofar as the subject-matter therein compromised. Its effect is not dependent upon complete and literal performance; rather, after execution, the parties are relegated to their remedies thereunder.

332 F. Supp. at 1341-42.

In *Hoffman Construction Co.*, *supra*, the plaintiff contractor sought damages from the government claiming that plaintiff was required to borrow money to finance work covered by change orders. The court held that, because the plaintiff and the government had expressly agreed upon the amount of the change order, plaintiff was precluded from recovering for increased costs produced by the change orders:

> . . . [I]n the case of each change order plaintiff issued a cost proposal. After studying said proposals and negotiating to various degrees concerning the proposals, defendant issued changes orders for the amounts proposed by plaintiff. Plaintiff admits that said final amount were agreed upon. The court concludes that such agreements and the issuance of final change orders constitute, in each case, an accord and satisfaction between the parties on the increased costs produced by the change orders. [Citations omitted.] Absent an express reservation by plaintiff limiting the scope of the

> settlement, plaintiff cannot now attempt to revive a portion of the claim.

7 Ct. Cl. at 528-29 (emphasis added).

The lessons of these authorities are clear: where parties to a contract execute negotiated, agreed-upon change orders to resolve a dispute or uncertainty under the contract, any claim for damages arising out of conduct occurring *before* the change order is executed, and falling within the scope of the change order, is extinguished.

Here, while the parties may disagree over the cause of the delays in resolving the wire color issue or whether Slidell was entitled to a refund of the discount, what is beyond dispute is the fact that the parties *expressly agreed* on the resolution of the wire color issues. In fact, they did so twice — once in Change Order No. 3 and again in Change Order No. 4. To the extent Slidell believed that the wire color issue was causing it to incur excess costs or that changes to the wire color provision in the contract would extinguish Millennium's entitlement to the discount, Slidell had the right to request an amendment to the Contract Price to compensate it. However, Slidell requested no monetary adjustment at all in Change Order No. 3, and only a monetary adjustment of $7,600 in Change Order No. 4 to compensate it. Both Change Order Nos. 3 and 4 are complete on their face and expressly provide that all other provisions and terms of the Contract remain unchanged. Slidell cannot now claim that it made a bad deal for itself and is entitled to more compensation than what it bargained for in September and December of 2000. Accordingly, Slidell's damages claims attributable to the wire color issues fail and Millennium is entitled to a directed verdict.

**CONCLUSION**

For the aforementioned reasons, Millennium asks this Court to grant a directed verdict in its favor.

Dated: February 15, 2005

HALLELAND LEWIS NILAN & JOHNSON, P.A.

By: s/ Matthew E. Johnson
Michael T. Nilan Reg. No. 79224
Scott A. Smith Reg. No. 174026
Matthew E. Johnson Reg. No. 235945
Amanda M. Cialkowski Reg. No. 306514
600 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis, Minnesota 55402
Telephone: (612) 338-1838

Attorneys for Defendant and Counterclaimant
Millennium Inorganic Chemicals Inc.