UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Slidell, Inc.,

Plaintiff,

v.

Millennium Inorganic Chemicals, Inc.,

Defendant.

Court File No. 02-CV-213 (JRT/FLN)

**SLIDELL'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL**

---

## INTRODUCTION

The jury's mixed verdict dramatically demonstrates that ultimate contract liability rested on the validity of Millennium's equitable estoppel and waiver defenses. Millennium's defenses are neither legally nor factually sustainable for four reasons: (i) Millennium failed to establish the elements of its equitable estoppel or waiver defenses; (ii) the jury instructions on the defenses have critical omissions; (iii) the instructions implied that either defense operates as a general bar to Slidell's breach claims as opposed to a specific breach; and (iv) some Millennium breaches cannot be excused by waiver or estoppel. Moreover, the jury's finding that Slidell's control flow and connectivity diagrams are not trade secrets is against the great weight of the evidence. As a result, the verdict answers on Questions 2 and 7 on the breach-of-contract and trade-secret claims should be set aside and a new trial ordered.

## FACTUAL BACKGROUND

The jury found that Millennium breached the contract, that Millennium's breaches were legally justified, and that Slidell breached. (Docket No. 426). The jury also decided that Slidell's proprietary information did not constitute trade secrets. (Id.) Finally, the jury found Slidell prevailed on its promissory estoppel claim, which meant that the jury found Millennium's conduct unconscionable. (Id.)

## LEGAL STANDARD

Slidell's post-trial motion based on Rules 50 and 59,[1] compel a new trial.[2] First, Federal Rule of Civil Procedure 50(b) presents the legal question of "whether there is sufficient evidence to support a jury verdict." Gray v. Bicknell, 86 F.3d 1472, 1478 (8th Cir. 1996) (*quoting* Fox v. T-H Continental L.P., 78 F.3d 409, 413 (8th Cir. 1996)). If sufficient evidence does not exist, Slidell is entitled to judgment as a matter of law. Second, Rule 59(a) allows the Court to grant a new trial using a standard less stringent than for judgment as a matter of law. Maxwell v. Baker, Inc., 160 F.R.D. 580, 581 (D. Minn. 1995). A new trial is appropriate when a verdict that is against the weight of the evidence results in a miscarriage of justice. Gray, 86 F.3d at 1480.

A new trial is warranted if the jury was not instructed on theories relevant to each party's case or if the instruction prejudiced the objecting party. "Each party is entitled to have the jury instructed on its theory of the case if there is any competent evidence in support of such theory and such theory and instruction is properly requested, even though the theory may be controverted by some evidence of the opposing party." Bartak v. Bell-Galyardt & Wells, Inc., 629 F.2d 523, 528 (8th Cir. 1980) (emphasis added); Walker v. AT&T Tech., 995 F.2d 846, 849

---

[1] Slidell preserved all its post-trial rights. At the close of Millennium's case-in-chief, Slidell moved for a directed verdict on Millennium's equitable estoppel and waiver defenses. (T. 3861-64). The Court denied Slidell's motion. (T. 3865). Slidell also objected to giving the instructions on Millennium's defenses to the jury. First, Slidell objected to Millennium receiving the same breach instructions that Slidell was entitled. (T. 3892:12-16 and 3896:1-7). Slidell also objected to instructing the jury on Millennium's waiver defense (T. 3907:1-19; T. 3909:5-25; T. 3911) and equitable estoppel defense. (T. 3916:19 – 17:4). Slidell submitted several trial briefs and proposed jury instructions on these issues. (Docket Nos. 356, 387, 404). The Court advised that all objections discussed during the charging conference had been preserved. The Court stated that all matters "suggested or proposed to the Court that the Court has not included in the final instructions, the objections to the Court's decisions are preserved." (T. 3991:22-24).

[2] If the Court grants a judgment notwithstanding the verdict on Millennium's justification defenses, Millennium's breach would not be excused. Slidell's breach would therefore be excused because the ruling would establish that Millennium breached the contract before Slidell stopped performing and initiated the lawsuit. (Docket No. 416, Inst. 12). A new trial would therefore be necessary to determine Slidell's contract damages.

(8th Cir. 1993) (If a requested instruction is necessary for a fair presentation of the case to the jury, "the trial court has an obligation to give an appropriate instruction on that issue."). Erroneous or incomplete jury instructions warrant a new trial where the objecting party shows it was prejudiced. Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minnesota, 2002 WL 31185884 *1 (D. Minn. 2002) (Tunheim, J.).

## ARGUMENT

### I. SLIDELL IS ENTITLED TO JUDGMENT AS A MATTER OF LAW AND NEW TRIAL ON MILLENNIUM'S EQUITABLE ESTOPPEL DEFENSE.

Millennium's equitable estoppel defense should not have been submitted to the jury[3] because Millennium did not submit probative evidence establishing the defense's elements. Moreover, the defense was logically incoherent because there was no relationship between the alleged misrepresentations or omissions and Millennium's breaches. Additionally, the instruction wrongly implied that equitable estoppel excused all of Millennium's breaches. Finally, the equitable estoppel instruction should have required the jury to find Slidell's conduct unconscionable and should have instructed the jury on the unclean hands doctrine.

#### A. Millennium Did Not Present Evidence Showing That Slidell Made Statements That It Knew to Be False or That Slidell Had a Duty to Speak.

To prove equitable estoppel, Millennium must first show that Slidell made false statements or that Slidell had a duty to speak or act. Browning v. Browning, 76 N.W.2d 100, 102 (Minn. 1956). Millennium claimed two possible omissions. Slidell's failure to inform

---

[3] The Court should not have instructed the jury on equitable estoppel because the issue of whether a promise must be enforced to avoid injustice is a question of law for the Court. Faimon v. Winona State Univ., 540 N.W.2d 879, 883 (Minn. Ct. App. 1985); Northern States Power Co. v. City of Mendota Heights, 646 N.W.2d 919, 925 (Minn. Ct. App. 2002) ("Equitable estoppel is a question of law subject to *de novo* review."); State v. Ramirez, 587 N.W.2d 595, 597 (Minn. Ct. App. 1999) ("The application of equitable estoppel presents a question of law."); Olson v. Synergistic Tech. Bus. Sys., Inc., 2000 WL 54315 *1 (Minn. Ct. App. 2000) ("Similarly, equitable estoppel seeks to avoid injustice when one party relied on the other's words."). Accordingly, the Court should decide the issue *de novo*.

Millennium that Slidell would not sign Change Order No. 5 and Slidell's failure to inform Millennium that Slidell was not going to sign a nondisclosure with RoviSys, a third party. (T. 3863-64) Because neither of these representations are actionable as a matter of law, there is no basis to submit the issue to the jury.

This Court has already held that promises to enter into contracts cannot be enforced through equitable estoppel. In dispatching Slidell's equitable estoppel claim on summary judgment, the Court noted a contract does not become binding until it is executed. (Docket No. 140, p. 32), citing Richie Co., LLP v. Lyndon Ins. Group, Inc., 316 F.3d 758, 761 (8th Cir. 2003). Additionally, the Court noted that "the doctrine of equitable estoppel is inapposite, because the Court has determined that no contract was formed. . . ." Id. at 35. In other words, equitable estoppel cannot be used to create a contract where no contract exists.

Both Change Order No. 5 and the RoviSys nondisclosure had to be executed in order for them to be valid. Minn. Stat. § 2-209. Because neither Change Order No. 5 nor the separate nondisclosure agreement with RoviSys was executed, neither became a contract under Richie Co. and cannot be willed into existence through equitable estoppel. (Docket No. 140, p. 35). To hold otherwise would ignore the law of the case and apply a fundamentally different standard to Millennium's equitable estoppel claim than the Court applied to Slidell's same claim.

### B. Millennium Did Not Present Evidence That Slidell Intended Millennium to Act on a Misrepresentation or Omission.

Even if Millennium could identify an actionable misrepresentation or omission, it did not offer any evidence on the third element of equitable estoppel. Millennium asserted that Slidell's failure to inform Millennium that Slidell had not signed Change Order No. 5 is a basis for equitable estoppel. (T. 3863-64). Millennium argued that the Change Order relieved Millennium of any liability for delay costs. The undisputed record, however, is that Slidell informed Millennium during the September 2001 meeting that Slidell wanted to be compensated

for its delay costs. (T. 3826:19 – 27:3; 3829:1-12; 3830:19 – 31:17; and Ex. 147). Simply put, Slidell could not have intended that Millennium rely on Slidell signing Change Order No. 5 because Slidell kept pressing for delay compensation.

**C. Millennium Did Not Prove Reasonable Good Faith Reliance.**

If Slidell somehow was silent when it had a duty to speak (e.g., Slidell would not sign Change Order No. 5), Millennium did not show it reasonably relied on such a misrepresentation or omission to breach the contract. Indeed, it is illogical for Millennium to claim that it breached the contract because it relied on Slidell. First, as a matter of law, a party cannot *reasonably* and in *good faith* rely on another's statements to engage in conduct that breaches the contract. Carlock v. Pillsbury Co., 719 F. Supp. 791, 829 (D. Minn. 1989) ("There cannot be reasonable reliance where the allegedly fraudulent promises directly contradict the terms of the contract."). Second, there is no causal relation between any of Millennium's breaches and Change Order No. 5. Third, Millennium knew Change Order No. 5 was unsigned. (T. 3826:19 – 27:3; 3829:1-12; 3830:19 – 31:17 and Exs. P147 and 151).

Likewise, Millennium cannot claim that Slidell's failure to inform Millennium that Slidell had not signed a non-disclosure agreement with RoviSys estops Slidell from enforcing the prior written permission clauses of the Contract's non-disclosure and license agreements. Millennium's witnesses admitted that the RoviSys agreement did not constitute permission to transfer Slidell's designs to RoviSys. (T. 3059-60 (Root); and 3201 (Calvin)). Because the nondisclosure did not constitute permission, there is no causal relationship between Slidell's omission and Millennium's decision to transfer Slidell's designs to RoviSys.

**D. The Instruction Wrongly Implied That Equitable Estoppel Excused All of Millennium's Breaches.**

The instruction also prejudiced Slidell because the Court did not instruct the jury that any estoppel argument is limited to the specific breach to which Slidell's representation or omission

related. Summary Judgment Order at 16 (Docket No. 140) (*citing* Transamerica Ins. Group at 183). Instead the instruction wrongly implied that estoppel operated as a bar to all Slidell's claims. (Docket No. 416, Instruction 13). This is both a legal error and inconsistent with the contractual provisions specifying that a waiver of one breach is not a general waiver. Ex. 12, 12; see Section II.A. below. Accordingly, Slidell is entitled to a new trial. BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 696 (2d Cir. 1993) ("A new trial is warranted if, taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law.").

**E. Slidell's Conduct Must Be Unconscionable and Tantamount to Fraud to Amount to Estoppel.**

Unconscionability should have been included as an element in Millennium's equitable estoppel defense. To circumvent the contract and statute of frauds to modify or waive terms of the contract by estoppel, Millennium must prove that Slidell's conduct was unconscionable and tantamount to fraud. Oxley v. Ralston Purina Co., 349 F.2d 328, 333 (6th Cir. 1965). Indeed, Slidell was required to show unconscionability to establish its European support estoppel claim and circumvent the statute of frauds. (Docket No. 416). It is fundamentally unfair for Millennium not to have to make the same showing, especially in light of the Contract's requirement of written waiver and Minn. Stat. § 336.2-209(3). Because the jury found Millennium's breaches legally justified, Slidell was prejudiced by the failure to include this instruction. Accordingly, the Court should order a new trial.

**F. Millennium Cannot Seek Equitable Estoppel as a Matter of Law.**

The Court should have granted Slidell's request to instruct that a party with unclean hands cannot seek estoppel. (T. 3916:17 – 17:4; Docket No. 387). Because estoppel is an equitable remedy, it can be invoked only by an innocent party. Macomber v. Kinney, 128 N.W. 1001, 1003 (Minn. 1910), aff'd, 130 N.W. 851 (Minn. 1911)). A party cannot seek equitable

estoppel if its "misleading tactics, concealments, misrepresentations and defaults exacerbated the situation." Moser v. Thorp Sales Corp., 256 N.W.2d 900, 908 (Iowa 1977).

By not informing the jury of the unclean hands doctrine, the instruction misled the jury by indicating that Millennium was entitled to an estoppel defense even if Millennium breached its duty of good faith and fair dealing, repudiated the contract, or acted unconscionably, or engaged in other conduct that constituted unclean hands. Moreover, Millennium's internal memoranda establish that Millennium's personnel had been ordered not to work on the LeHavre and Ashtabula portions of the project for over a year and that Millennium had suspended the LeHavre portion of the project. (T. 3060 (Dissaux); 2959-60 (Root); and Ex. P114). This evidence certainly supports an unclean hands instruction. Further, the jury concluded that Millennium breached the Contract and acted unconscionably in regard to the promissory estoppel claim. In finding unconscionability the jury necessarily found that Millennium acted with "no regard for conscience; affronting the sense of justice, decency, or reasonableness." (Docket No. 417). Therefore, given the jury's findings that Millennium breached and acted unconscionably, the jury could have easily found that Millennium had unclean hands.

If Millennium argues that the jury's finding of unconscionability cannot support a finding of unclean hands with regard to the equipment contract, Millennium will concede a critical point. One of Slidell's chief objections is that the equitable estoppel instruction allowed the jury to conclude incorrectly that Slidell was estopped from asserting any breach, as opposed to the specific breach induced by Slidell's misrepresentation or omission. If Millennium insists on a precise relationship between the misconduct and the availability of equitable relief, then the jury instruction regarding equitable estoppel failed to meet Millennium's own criterion. The contradiction becomes more glaring when one considers that equitable estoppel requires a link between the representation or omission and the decision to breach, while the unclean hands

doctrine is a general bar to any equitable relief. Summary Judgment Order at 6 (Docket No. 140) *citing* Elwood v. Mid States Commodities, 404 N.W.2d 174, 184 (Iowa 1987); Wyeth v. Natural Biologics Inc., 395 F.3d 897, 902 (8th Cir. 2005); Order at 16 *citing* Transamerica Ins. Group, 267 N.W.2d at 183.

## II. SLIDELL IS ENTITLED TO JUDGMENT AS A MATTER OF LAW AND A NEW TRIAL ON MILLENNIUM'S WAIVER DEFENSE.

The jury instruction regarding waiver was so fundamentally flawed that it virtually preordained a jury finding that Slidell waived Millennium's breaches. The instruction contained four defects each of which is discussed below.

### A. Because the Contract Required All Waivers to Be in Writing, the Jury Should Have Been Instructed that to Find a Waiver, the Written Waiver Provision Must Have Been Waived as Well.

The waiver instruction ignored the Contract terms forbidding unwritten waivers:

> Waivers shall not be binding unless set forth in writing and signed by the party allowing the waiver. No waiver of a breach of any provision of this Contract shall constitute a waiver of any other breach of the provision or any breach of any other provisions of this Contract.

(Ex. 12, ¶ 12).

If sophisticated parties require written waivers, the Court must instruct the jury that it must find the waiving party waived both the writing requirement and the waived provision to find that the other party's breach was legally justified. C.I.T. Corp. v. Jonnet, 214 A.2d 620, 622 (Penn. 1965); see also Infinity Products, Inc. v. Premier Plastics, LLC, 2001 WL 1640105 *3 (D. Minn. 2001) (Magnuson, J.) (courts should enforce no-unwritten-waiver provisions and not lightly consider them waived).

Because the instruction did not explain that Slidell needed to waive both requirements, the instruction disregarded the legal protections of the U.C.C.[4] and the parties' negotiated

[4] The U.C.C. allows parties to prohibit modification without prior written agreements:

agreement. Indeed, public policy and justice require that courts not allow "no-unwritten-modification" clauses to be waived easily. In C.I.T. Corp., the defendants argued that a contract prohibiting unwritten modifications may be waived by subsequent oral agreements, to which the Court responded,

> This is true but there must first be a waiver of the requirement which has been spelled out in the contract [prohibiting oral modifications]. Otherwise, written documents would have no more permanence that writings penned in disappearing ink. If this … argument were to prevail, contractual obligations would become phantoms, solemn obligations would run like pressed quicksilver, and the whole edifice of business would rest on sand dunes supporting pillars of rubber and floors of turf. Chaos would envelop the commercial world.

Id. (emphasis added). Similarly, the Seventh Circuit stated,

> If section 2-209(4), which as we said provides that an attempted modification which does not comply with subsection (2) can nevertheless operate as a "waiver," is interpreted so broadly that *any* oral modification is effective as a waiver notwithstanding section 2-209(4), both provisions become superfluous and we are back in the common law - only with not even a requirement of consideration to reduce the likelihood of fabricated or unintended oral modifications…. Whether called modification or waiver, what National Metal Crafters is seeking to do is to nullify a key term other than by a signed writing. If it can get away with this merely by testimony about an oral modification, section 2-209(2) becomes very nearly a dead letter.

Wisconsin Knife Works v. Nat'l Metal Crafters, 781 F.2d 1280, 1286 (7th Cir. 1986) (cited approvingly in Infinity Products, Inc. v. Premier Plastics, LLC, 2001 WL 1640105 (D. Minn. 2001)). The failure of the instruction to inform the jury that Slidell needed to waive both requirements justifies a new trial. M.K. Metals, Inc. v. Container Recovery Corp., 645 F.2d 583, 587-89 (8th Cir. 1981) (ordering a new trial when the instructions did not provide a complete analysis of the law or removed a fact issue).

---

> A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such requirement on a form supplied by the merchant must be separately signed by the other party.

Minn. Stat. § 336.2-209(2). In addition, the U.C.C. requires all modifications that would be subject to the statute of frauds to be in writing. Minn. Stat. § 336.2-209(3).

Moreover, Millennium's position on non-written waiver is entirely inconsistent[5] with its position regarding the supervisory scope change order that would have added $417,000. Millennium argues that the Contract's written waiver provision should be ignored, while arguing that Slidell must scrupulously follow the Contract's change order provisions with regard to the $417,000 change order – to which Millennium assented in writing. (Ex. P57) Such disparate treatment is unfair because waiver and changes in the Contract's scope are functionally the same thing: contract modifications. Non-written waiver in this context not only violates both the U.C.C. and public policy, but also is patently unjust. The Court should enter judgment as a matter of law and order a new trial because there was no written waiver.

**B. Millennium Submitted No Evidence For a Reasonable Jury to Find Waiver.**

To establish waiver, Millennium needed to show that Slidell "had full knowledge of the facts, had full knowledge of … [its] legal rights, and intended to relinquish those rights." Freitag v. Wolf, 226 N.W.2d 868, 870 (Minn. 1975). A waiver must "clearly be made to appear from the facts disclosed." Hauenstein & Bermeister, Inc. v. Met-Fab Industries, Inc., 320 N.W.2d 886, 892 (Minn. 1982). Millennium did not offer sufficient evidence that would entitle a reasonable jury to find such a clear waiver, much less a waiver of every breach.

Lacking evidence of a clear and knowing waiver, especially without a written waiver, Millennium was forced to retreat to "implied waiver." Implied waiver, however, is a narrow defense requiring a stringent showing: "The conduct must be so consistent with and indicative of an intention to relinquish [the particular] right … and so clear and unequivocal that 'no other reasonable explanation of the conduct is possible.'" Medicare Glaser Corp. v. Guardian Photo,

---

[5] Millennium was even inconsistent in its inconsistency. Millennium insisted that the first version of Change Order 5 which added $417,000 to the price of the contract was unenforceable because it was unexecuted, but then insisted that a later version of Change Order 5 that removed supervisory from scope was enforceable, even though that version also was unexecuted.

Inc., 936 F.2d 1016, 1021 (8th Cir. 1991) (quoting United Missouri Bank South v. Cole, 597 S.W.2d 209, 211 (Mo. App. 1980)). Here, the waiver instruction articulated a much lower standard,[6] which allowed the jury to conclude that Slidell waived a breach even if its conduct was subject to more than one interpretation, even if Slidell continued to perform other parts of the contract, or even if Slidell continued to perform under a reservation of rights. Paradoxically, the instruction allowed the jury to conclude that conduct that as a matter of law could not constitute waiver in fact did, justifying a new trial.

**C. The Court Failed to Instruct the Jury on Slidell's Reservation of Rights.**

The Court should have instructed the jury regarding Slidell's reservation of rights in response to Millennium's waiver defense. Indeed, the prejudice to Slidell is apparent from the verdict: the jury essentially said that Millennium's breaches were excused because Slidell continued to perform and did not sue immediately.

From a business perspective, such a finding ignores practical realities. From a legal perspective, such a requirement contradicts the U.C.C. and its public policy goals. According to Minn. Stat. § 336.1-308,[7] a party can continue to perform a contract despite the other party's breach and still reserve its right to sue for damages.

> This section . . . is intended to apply in any situation where, before performance of a transaction has been made or completed, some dispute arises over the deal. In such situations, one party's failure to proceed with or to accept performance as demanded or tendered by the other may result in extensive liability for breach if the claim of the one so failing is rejected and the other's position is held to be valid. On the other hand going ahead with or continuing to receive performance as demanded or tendered and despite the dispute involves a risk of loss of rights by "waiver," "estoppel," "election" or "accord and satisfaction." This election gives a party in such predicament the privilege, by "explicit reservation of rights" in any appropriate language, to continue to render or receive performance "in a

[6] The instruction provided that waiver occurred if Slidell "continued to exercise its rights under the contract or continued to demand performance after Millennium's breach." (Docket No. 416, Instr. 13).

[7] Minn. Stat. § 336.1-308 was originally codified as Section 336.1-207.

> manner demanded or offered by the other party" without jeopardy to the rights reserved when later asserted.

Minn. Stat. § 336.1-308, cmt. Slidell presented evidence that it had reserved its rights (T. 2992-93 (Root); 3829 (McGregor); and Ex. 304), so the jury should have been instructed on a reservation of rights. See Minn. Stat. §§ 336.1-308, 2-703, 2-704; see also Northern Helix Co. v. United States, 456 F.2d 546, 553-55 (C. Cl. 1972); McAlpine v. AAMCO Automatic Transmission, Inc., 46 F. Supp. 1232, 1251 (S.D. Mich. 1978) ("An election to continue performance does not constitute waiver of the right to damages for a breach.").

Indeed, Millennium conceded that Slidell continued to perform under a reservation of rights. Ron Root testified that during an August 31, 2001 conference call, Jim McGregor threatened to sue Millennium if it did not refund the discount. (T. 2992-93 (Root); Ex. 304). The parties met the following week and agreed to disagree about Millennium's refusal to refund the discount and compensate Slidell for the delays. (T. 3829:1-12) This evidence establishes Slidell reserved its rights, and the jury should have been instructed accordingly. The failure to instruct the jury on reservation of rights entitles Slidell to a new trial. Walker v. AT&T Tech., 995 F.2d 846, 849 (8th Cir. 1993) (ordering a new trial for failure to instruct on an affirmative defense).

### D. The Court Failed to Instruct the Jury on Slidell's Right to Proceed in a Commercially Reasonable Manner.

The U.C.C. explicitly allowed Slidell to proceed in a commercially reasonable manner without waiving its damages. Minn. Stat. § 336.2-704 allows a seller with unfinished goods to exercise "reasonable commercial judgment for the purpose of avoiding loss . . . either complete the manufacture and wholly identify the goods to the contract or cease manufacture . . . or proceed in any other reasonable manner." The statute gives Slidell the "express power to complete manufacture" and the burden is on Millennium "to show the commercially

unreasonable nature of the seller's action in completing manufacture." Id., cmt. 2; see also Northern Helix Co. v. United States, 456 F.2d 546, 553-555 (C. Cl. 1972) (a party can continue performance and accept payments without waiving its rights to sue). In addition, Slidell's acceptance of payment after Millennium's breach will not waive any claim for breach unless the acceptance is an accord and satisfaction.[8] Minn. Stat. §§ 336.2-703, 336.2-704. "An election to continue performance does not constitute waiver of the right to damages for a breach." McAlpine v. AAMCO Automatic Transmission, Inc., 46 F. Supp. 1232, 1251 (S.D. Mich. 1978).

Yet the instructions did not inform the jury that Slidell had the right to proceed in a commercially reasonable manner. Instead, instruction 13 created exactly the opposite impression. When combined with the failure to inform the jury that waiver may be found only where there is no other reasonable explanation of the conduct, the net impact is to instruct that any continued performance by Slidell after a breach constitutes waiver. Such a serious misstatement of the law doomed Slidell to a finding of waiver.

**E. Waiver Did Not Apply to Many of Millennium's Breaches.**

Finally, the waiver instruction misinstructed the jury that all of Millennium's breaches could be waived. Even if Slidell's continued performance might be considered a waiver of some breaches, several of Slidell's breach claims cannot be waived.

First, a party who breaches its duty of good faith and fair dealing cannot raise a defense of waiver or estoppel. See 46-50 WHITE & SUMMERS UNIFORM COMMERCIAL CODE § 1-5 (2d ed. 1980) (a party cannot seek modification or waiver of contract provisions through bad faith conduct); Niazi v. St. Paul Mercury Ins. Co., 121 N.W.2d 349, 356 (Minn. 1963) (a party that

---

[8] Slidell's acceptance of payment after Millennium's breach will not waive any claim for breach unless the acceptance meets the requirement of accord and satisfaction. Northern Helix, 456 F.2d at 355; Minn. Stat. §§ 336.2-703, 336.2-704. No evidence suggests an accord and satisfaction.

acts in bad faith cannot raise contractual or equitable remedies). Allowing Millennium to circumvent its duties of good faith and fair dealing by claiming that Slidell waived such breaches is fundamentally at odds with contract law and the U.C.C. See Minn. Stat. § 336.1-201(20).

Second, a party cannot waive its rights to sue if the other party repudiates the contract. If Millennium anticipatorily repudiated the contract, Slidell is excused from completing performance and may seek damages for a total breach. Minn. Stat. § 336-2.610; Nat'l Liberty Corp. v. Wal-Mart Stores, Inc., 120 F.3d 913, 916 (8th Cir. 1997).

## III. THE COURT IMPROPERLY INSTRUCTED THE JURY TO ALLOW MILLENNIUM TO CLAIM SLIDELL'S BREACHES.

Slidell's breach of contract claim was based on the following theories:

- breach of the Contract's express terms;
- failure to specify in a timely manner as required by Minn. Stat. § 336.2-311(2);
- preventing a contract term from being completed;
- anticipatory repudiation; and
- breach of the duty of good faith and fair dealing.

Complaint (Docket No. 1). Millennium's claim of breach on the other hand, was only that Slidell failed to deliver the equipment. See Amended Answer and Counterclaim. (Docket No. 58).[9]

Bestowing on Millennium the ability to mirror Slidell's numerous breach theories ambushed Slidell. Slidell did not receive notice of these theories and therefore could not conduct discovery on them, could move for summary judgment on them, and could not prove affirmative defenses at trial. Moreover, section 336.2-311 applies only to buyers like Millennium, not sellers

[9] In its closing argument, Millennium stated that Slidell's failure to produce schedules constituted a breach, but there were no damages associated with this alleged breach and this cannot be the basis of its breach of contract claim. (T. 4008-09).

like Slidell, but Millennium still got the benefit of this instruction. Millennium's closing argument highlights the prejudice to Slidell. In closing argument, Millennium argued for the first time that Slidell had breached the scheduling provisions of the contract. (T. 4008-09). Slidell easily could have proven the same defenses that Millennium relied on — equitable estoppel or waiver — to excuse this alleged breach.[10] But Slidell did not have that opportunity because it did not receive notice of these theories until near the end of trial. Such fundamental unfairness compels a new trial. The breach of contract instruction violated Slidell's right to provide the jury specific instructions related to each party's claims. BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 696 (2d Cir. 1993) ("A litigant is entitled to have the jury instructed as to his claims and theories of law if supported by the evidence and brought to the attention of the Court.") Given that a prior breach by Slidell potentially supported the jury's finding that Millennium's breach was legally justified, Slidell was prejudiced by the instruction and is entitled to a new trial.

## IV. THE OVERWHELMING WEIGHT OF EVIDENCE SHOWS THAT MILLENNIUM'S BREACHES WERE NOT WAIVED NOR COULD SLIDELL BE ESTOPPED FROM SEEKING DAMAGES.

### A. Millennium's Breaches of the Confidentiality and Software Licensing Agreement Were Not Waived and Slidell Cannot Be Estopped.

The overwhelming weight of evidence supports the conclusion that Slidell did not waive and should not be estopped from asserting its contractual rights prohibiting Millennium from

[10] Although Millennium's breach theory was solely limited to Slidell's failure to deliver the equipment, the Court instructed the jury that if "Slidell materially breached the contract before Millennium materially breached the contract, then Millennium's breach is excused." (Docket No. 416, Inst. No. 13). The Court did not inform the jury that Millennium's breach claim was limited to failure to deliver the equipment and that therefore, this defense was temporally and sequentially illogical.

transferring proprietary information to RoviSys without prior written consent. All of the evidence shows that Millennium breached when it transferred designs to RoviSys.[11]

Five irrefutable facts confirm that Slidell did not waive this breach: (1) the Contract requires Millennium to obtain written consent before transferring Slidell's technical information (Ex. 12, Exs. A & B); (2) Millennium never obtained Slidell's written consent to transfer information to RoviSys (T. 782; 789-90, 791:17-18, 1155-56 (McGregor); T. 3009-10 (Root)); (3) Millennium transferred Slidell's proprietary information (including control flow and connectivity drawings) to RoviSys (T. 768-69, 813-14 (McGregor); (Calvin); Exs. 218, 798, 806, 2663); (4) Slidell did not sign the RoviSys "Secrecy Agreement" (Ex. P160; T. 3334 (Hughes); T. 3010 (Root); T. 1155-56 (McGregor); and (5) even if signed, RoviSys' Secrecy Agreement did not authorize Millennium to transfer any information to RoviSys. (T. 3009-10 (Root); T. 3201 (Calvin); T. 1155-56 (McGregor)). Millennium's witnesses all agreed on these five facts.

Millennium may argue that Slidell consented to Millennium's transfer of information because (1) Slidell received a Secrecy Agreement from RoviSys or (2) Tom Hanson was present at a meeting with RoviSys employees. These facts alone cannot establish waiver or estoppel.

The mere fact that <u>RoviSys</u> sent Slidell a Secrecy Agreement does not estop Slidell from enforcing its contractual rights with <u>Millennium</u>. The Contract prohibits Millennium from transferring technical information to a third party without prior signed consent. (Ex. 12, Exs. A & B). Millennium's initial project manager directed his employees not to "share any documents

---

[11] Indeed, the evidence confirmed the Court's summary judgment analysis:

> Slidell has established a prima facie case that Millennium breached the confidentiality agreement in the contract. Millennium employees concede that information was transferred to RoviSys without Slidell's consent…. There is no question that Millennium did not have prior written consent before transferring the information to third parties.

(Summary Judgment Order, p. 27 (Docket No. 140)).

authored by Slidell" and admitted that it would be "legal error [to] send documents that were Slidell's which were not allowed by our contract without prior permission." (Dep. 315-17 (Ramsay); Ex. P65) ("[W]e just couldn't share anything. I was taking care that we didn't violate the Slidell contract.") Notably, the e-mail admonishing employees not to transfer Slidell's documents to RoviSys was sent minutes after Millennium met with RoviSys to tell RoviSys about Slidell's equipment so that it could develop a competing supervisory system. (Ex. 65).

Some of Millennium's employees claimed they "assumed" that RoviSys' Secrecy Agreement, if signed, would allow Millennium to transfer Slidell's proprietary information. (T. 3332 (Hughes)) Others on Millennium's side knew better. (T. 3009-10 (Root); T. 3201 (Calvin)). All parties agree that Slidell did not sign RoviSys' Secrecy Agreement. (Ex. P160; T. 792 (McGregor); T. 3010 (Root); T. 3200 (Calvin)). Moreover, no Millennium employee admitted to seeing, let alone reading, the Secrecy Agreement and no Millennium employee asked for Slidell's permission (or received it) to transfer technical information to Slidell. (T. 3332-33 (Hughes); T. 2942-43 (Root)) Meanwhile, no RoviSys employee ever asked if Millennium had permission to give away Slidell's information. (T. 3183 (Calvin)) ("I didn't determine whether Millennium had permission to information. I accepted the information."); (Polaski Dep. 45:10-19; 109:1-8; 109:25-111:05) (same). As such, Slidell's refusal to sign the Secrecy Agreement did not affect Millennium's duties or obligations.

Considering these facts, it is impossible to conclude that Slidell either waived its rights or that Millennium reasonably relied on its incorrect assumption that Slidell signed the Secrecy Agreement when the agreement did not authorize Millennium to transfer any information to RoviSys. Blind ignorance cannot be a defense to breaching a contract.

Slidell also did not waive merely because Tom Hanson, a low-level Slidell programmer, sat in on a meeting with Millennium employees on November 1, 2001. First, Hanson did not

provide Millennium any information relating to Slidell's OEE formula, control flow diagrams, connectivity drawings or other proprietary information. (T. 2302-06 (Hanson)). He provided information relating only to the Matrix, which was not useful for designing a supervisory system. (T. 1156-58 (McGregor)) This information was easily attainable and not generally considered proprietary. (T. 2305 (Hanson)). Millennium knew Mr. Hanson was unaware that Millennium was transferring proprietary information to RoviSys during or after the November 1, 2001 meeting. Moreover, Mr. Hanson never gave Millennium permission to transfer the control flow diagrams to RoviSys. (T. 3222). In fact, Bill Vogtmann's e-mail states, "We have tried to keep this part of the program [to obtain the memory locations in the equipment] very low key and will work with Tom Hanson, Slidell's programmer, while doing our utmost to avoid harassing him." (Ex. P232)

The overwhelming weight of the evidence confirms that Millennium knew Tom Hanson was a low-level programmer who did not have authority to waive Slidell's contractual rights and did not transfer proprietary information. Even if Mr. Hanson did transfer information to RoviSys, that did not give Millennium permission to do the same. Millennium knew this and therefore acquired documents from Slidell without informing Slidell that it was transferring the documents to RoviSys. These facts cannot support a finding of unequivocal waiver.

**B. Slidell Did Not Waive Millennium's Breaches for Failing to Provide Specifications for LeHavre and Ashtabula.**

The overwhelming evidence shows that Millennium deliberately delayed the LeHavre and Ashtabula equipment by failing to approve technical specifications. By failing to seasonably provide specifications, Millennium breached. (Jury Instruction 12; Minn. Stat. § 336.2-311(3)). Moreover, the evidence shows that Millennium's conduct was intentional so the conduct also breached Millennium's duty of good faith and fair dealing – on an unwaivable breach.

Millennium was not committed to following through with the LEH portion of the contract. During the summer of 2000, Mark Ramsay ordered David Hughes not to work on the LEH and ASH systems. As early as November 17, 2000, Millennium considered canceling the LEH equipment and recognized that by doing so, Millennium would be acting in bad faith. (Ex. P114; T. 3060 (Dissaux); T. 2959-60 (Root)). On December 27, 2000, the capital improvements committee discussed delaying or canceling the LEH equipment. (Ex. P2097) A Millennium memo from Mr. Berwanger admitted that the LEH portion of the project was suspended. (Ex. P2712). The day before Slidell initiated the lawsuit, Mr. Berwanger asked Jim McGregor if Slidell could sell the LEH equipment to someone else the day Slidell filed this lawsuit. (T. 713 and Ex. P114). Mr. Root admitted that Millennium would have been able to resolve its cash flow problems if Slidell had been willing to sell the LEH equipment to a third party. (T. 2960-61 (Root)).

The project manager for LEH, Antoine Dissaux, admitted that Millennium took more than eight months to approve the LEH general arrangement drawings (from February to October 2000) despite the fact that the typical time for approving general arrangement drawings is two to three weeks. (T. 3028, 3059-60 (Dissaux); Ex. P2564). Moreover, after Millennium decided that it needed the drawing modified in the fall of 2001, Millennium never forwarded the necessary drawing to Slidell showing the new plant elevations. (T. 3070-76 (Dissaux); T. 535-36, 624 (McGregor)).

Similarly, Slidell was unable to finish the ASH equipment because Millennium refused to accept the safety circuitry. (T. 541-43). David Hughes refused to accept STL’s electrical design for ASH because it was too safe. (Hughes Dep. 164:7-12).

In short, it is indisputable that Millennium breached the contract by delaying the ASH equipment and seeking to cancel the LEH equipment order. There is no evidence that Slidell waived these breaches, let alone that it unequivocally communicated its willingness to delay.

### C. Slidell Did Not Waive Millennium's Breach for Failing to Refund the Discount.

The overwhelming evidence shows that despite the fact that Millennium recognized that it was not entitled to the discount, it refused to refund it. Slidell was entitled to the discount for three primary reasons. First, to be eligible for the discount on LEH equipment, Millennium needed to sign the LEH the Contract by April 1, 2000. (Ex. P12, p. 8). Millennium did not meet this deadline (T. 379-80 (McGregor)). Second, Millennium witnesses repeatedly admitted that Slidell was entitled to a refund of the discount because the machines were not identical. (Root Dep. 120:10-17). For example, Nick Sands recognized that wire colors were not identical, "I agree to some extent with Slidell that the machines are not identical…. Perhaps we should pay some money back from the discount schedule." (Ex. P360); Sands Depo. 51:16-53:10). Similarly, Sands argued (to no avail) that the European equipment should be wired the same so "all European will be identical as far as Slidell are concerned and this is in line with the contract." (Ex. 346) Third, the machines were also not manufactured simultaneously. Mark Ramsay admitted that delays in the ASH plant prevented Slidell from simultaneously manufacturing the equipment and he was concerned that this "might jeopardize the discounts… negotiated on the contract." (Sands Dep. 159:18-21; Ex. 16). These facts are not disputed.

On the other hand, no evidence showed that Slidell unequivocally waived its rights to collect the $1.473 million discount. The only evidence is that the machines were not identical or simultaneously manufactured, Slidell demanded a refund, and Millennium refused.

On July 7, 2001, Aaron Skogen requested a Change Order refunding the $1.473 million discount. (Ex. 2053). A September 6, 2001 meeting, Jim McGregor demanded that refund.

(Ex. 304). Although Millennium recognized its refund obligation, Ron Root "wouldn't accept any invoices [or change orders] that included a rebate of the discount." (T. 2926-27). Mr. Root refused the refund because he mistakenly thought that doing so would make Millennium liable for the delays and other problems associated with the project. (T. 2925 (Root); Ex. P669, HV009497) ("To give up the discount says we are to blame for the project.")

Millennium's only argument that Slidell waived the refund claim is that Slidell submitted change orders that did not reflect the right to a discount. This argument is illogical because the wire change orders did not address the discount and were signed under protest (T. 1633, 2194-95, 2218-19 (McGregor)) and the change order to remove the supervisory system was never signed by Slidell. (T. 3826:19 – 27:3; 3829:1-12; 3830:19 – 31:17 and Ex. 147). Furthermore, none of the change orders negated the facts that the Contract was not signed in time but did require the equipment to be identical and manufactured simultaneously. It is impossible to conclude that Slidell unequivocally waived its right to refund the discount or that Millennium reasonably relied on Slidell's failure to sign Change Order No. 5.

## V. THE COURT SHOULD ORDER A NEW TRIAL ON SLIDELL'S TRADE SECRET CLAIM.

The jury decided that Slidell's proprietary information was not a trade secret. The jury got it wrong. A trade secret may consist of a formula, pattern, compilation, program, device, method, technique, process, or other type of information. Minn. Stat. § 325C.01. To constitute a trade secret, the information must (1) not be generally known or readily ascertainable, (2) gain economic value from its secrecy, and (3) the party must make reasonable efforts to maintain its secrecy. Minn. Stat. § 325C.01. The overwhelming evidence shows that Slidell's connectivity and control flow diagram meet these requirements. Indeed, both sides agreed on two things: (1) Slidell maintained secrecy and (2) the information obtained value from being secret.

### A. Slidell's Control Flow Diagrams and Connectivity Drawings Are Not Known or Readily Ascertainable.

A control flow diagram is a high-level flowchart that describes how the supervisory system interacts with the equipment stream and the business side programming. It defines the variables collected from the approximately 5000 input and outputs ("I/O") and PLCs throughout the equipment and maps how the information flows. (T. 1533 (Williams); T. 722-25 (McGregor)) Over several years, Slidell was able to develop a system for distilling the relevant information from the overwhelming amount of data monitored by the PLCS. (T. 726-27 (McGregor)). The control flow charts are a high-level road map for detailing this process.

Connectivity is "the architecture of the hardware and the communications between the electronic or electrical devices on the machinery… it's the pathways and hardware that the data moves through, out, and between." (T. 729 (McGregor)). Connectivity drawings are trade secrets because they contain the information necessary to connect the physical hardware of the machines to the electrical wiring and the supervisory system, they explain how data flows throughout hardware and the packaging line. (T. 581, 722 (McGregor)). The overwhelming evidence shows that connectivity is not open or obvious:

> Just because you have these I/O points, you don't necessarily know what you want to do with those I/O points. If you have a flowchart, you can understand where the data points have to go to, when you need data, why you need data. The I/O points in and of themselves are of limited value. You have to be able to apply some logic over the top of them as to what's important, when, and where it needs to be directed on the connectivity. They are -- when you put them together hand in glove is when you start to have a system. It's why we had to do the flowcharting first to determine the connectivity. We had to define what the requirements were, what data needed to move where, and then we could start to determine an architecture to accomplish what was defined in the flowcharts.

(T. 730 (McGregor)).

It is undisputed that the connectivity drawings and control flow diagrams could not be reverse-engineered without a long lead time. (T. 729 (McGregor)). One would have to start

with the final code and work backward to determine the location and information monitored by each I/O point and then determine how each I/O points relate to each other and the entire system. (T. 728-29 (McGregor)). RoviSys admitted that it needed the information design to build the supervisory system. (Polaski Depo. 80:08-81:06, 89:01-89-25). Even David Hughes, who "claimed" he created the control flow diagrams, admitted that Slidell created the control flow diagrams. Hughes Depo. 237:04-238:08. Moreover, the control flow diagrams contained proprietary information from Slidell software to which Mr. Hughes did not have access so he could not have created the control flow diagrams. (T. 3816-3818). In addition, connectivity drawings were incorporated within the supervisory system and were necessary to develop the software.

This design information typically qualifies for trade secret status. See Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 899 (Minn. 1983) (citing A.H. Energy Co. v. Marcan Prods. Corp., 389 F.2d 11, 16 (2d Cir. 1968) ("It is well settled that detailed manufacturing drawings and tolerance data are prima facie trade secrets."); Zawel v. Edutronics, 520 N.W.2d 520, 521 (Minn. Ct. App. 1994) (software is a trade secret).

**B. The Control Flow Diagrams and Connectivity Drawings Gain Value from Their Secrecy.**

The overwhelming evidence showed that the control flow diagrams and connectivity drawings added substantial value to the supervisory system. For example, Exhibit 860 notes that the implementation of these trade secrets will:

> enable all MIC Slidell packing systems (ASH, STL, & LEH) to be operated efficiently with minimum staffing by providing operators and engineers with information they will use to continuously improve area performance. It will automate SAP interactions (currently completed manually each shift) and be responsive to package type requirements enabling automated production planning.

Millennium recognized that RoviSys could not develop an alternative system without Slidell's control flow diagrams and connectivity drawings. (T. 616, 732 (McGregor); T. 1288-89

(Skogen); Ex. 2604). Millennium initial project manager concluded that "the more information that Slidell was able to provide to [Millennium] and RoviSys, the less [Millennium] would have to pay RoviSys to do the system. (Ramsay Depo. 312:11-15; T. 783 (McGregor)). Only because Millennium transferred substantial technical information to RoviSys was RoviSys able to charge $157,000 to build a competing supervisory system. (T. 784 (McGregor)). Moreover, Millennium and RoviSys recognized the value of keeping the information secret by protecting the information in their nondisclosure. (Ex. 255). Furthermore, the value of the supervisory system would be diminished if it became public. (T. 783-84 (McGregor)). This is more than sufficient to meet the requirements for a trade secret.

If "substantial time and money would be required of a competitor to develop the same information, that information has economic value." Surgidev Corp. v. Eye Tech, Inc., 648 F. Supp. 661, 688 (D. Minn. 1986) (MacLaughlin, J.). Where only few people have the ability to design the trade secret and it cannot readily be reverse-engineered, the trade secret is not readily ascertainable. Scott Equip. Co. v. Stedman Mach. Co., 2003 WL 21804868, *2 (D. Minn. July 31, 2003) (Ericksen, J.).

**C. Slidell Reasonably Maintained the Secrecy of its Trade Secrets.**

The overwhelming weight of evidence shows that Slidell made reasonable efforts to maintain the secrecy of its proprietary information, including:

- designing the building with security enhancements (badge system, video cameras, limited access),
- incorporating computer passwords and user profiles to limit access,
- using nondisclosure agreements with customers and employees,
- compartmentalizing electronic data on the computer system,
- including notations regarding ownership and confidentiality on drawings, and
- limiting proprietary information to and of customers.

(T. 714-721 (McGregor); T. 1533 (Williams)). Further, Slidell entered into multiple confidentiality agreements that prohibited Millennium from using or transferring any of Slidell's proprietary information to third parties without prior written consent. (T. 272, 308; Exs. P12; P2564, P2565, D1715). Millennium's employees testified that Slidell restricted access to its facilities and documents more than Millennium's other vendors. (Hamper Depo. 71:19 – 73:25). One of Millennium's major concerns was to "get [Slidell] over its secrecy fears." (Ex. P2167). All these factors establish that Slidell took reasonable efforts to maintain the secrecy of its trade secrets. Wyeth, 395 F.3d at 900 (noting that absolute secrecy is not required for trade secrets).

Because the overwhelming evidence shows that Slidell's control flow diagrams and connectivity drawings meet the statutory elements of trade secrets, the Court should order a new trial on that issue to avoid a miscarriage of justice.

## CONCLUSION

For the foregoing reasons, the Court should grant judgment as a matter of law or order a new trial.

Dated: April 14, 2005

s/ Jeffrey W. Post

Thomas S. Fraser (#31641)
Jeffrey W. Post (#271883)
Jeffrey W. Jones (#311418)
Wade S. Davis (#326860)
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
Telephone: (612) 492-7000
Facsimile: (612) 492-7077

ATTORNEYS FOR SLIDELL, INC.

#3093342\3