**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Slidell, Inc.,

Plaintiff and Counterdefendant,

v.

Millennium Inorganic Chemicals Inc.,

Defendant and Counterclaimant.

Court File No. 02-CV-213 (JRT/FLN)

**AFFIDAVIT OF SCOTT A. SMITH**

STATE OF MINNESOTA )
) ss
COUNTY OF HENNEPIN )

SCOTT A. SMITH, after being duly sworn upon his oath, hereby deposes and states the following:

1. I am an attorney licensed to practice law in the State of Minnesota. I am one of the attorneys representing Defendant and Counterclaimant Millennium Inorganic Chemicals Inc. ("Millennium") in this matter. I am an adult witness legally competent to testify herein as to the limited matters set forth below, which are based upon my personal knowledge.

2. On April 17, 2002, this Court entered a preliminary injunction upon Millennium's motion. Generally speaking, that preliminary injunction forbade Plaintiff Slidell, Inc. ("Slidell") from taking any steps to dissemble the partially-constructed packaging machines then being built by Slidell for Millennium, or reselling, returning or conveying in any manner any of the equipment or component parts to any third party. *See* the Court's Memorandum Opinion and Order dated April 17, 2002 at 12-13. Because

the partially-completed equipment was then sitting on Slidell's production floor, and Slidell had asserted that it needed to dispose of the equipment to free up floor space for other projects, in its April 17, 2002 ruling the Court ordered the parties "to meet and confer and reach agreement concerning storage of the subject equipment until a full termination of the merits can be made." *Id.* at 14.

3. On April 23, 2002, I wrote to counsel for Slidell and indicated, *inter alia*, that if Slidell needed to free up production space on its shop floor, Millennium would search for an appropriate storage facility; however, if Slidell did not need the work space on its production floor, it might be best simply to leave the equipment in place. I also requested that Slidell's counsel respond at their earliest convenience regarding the issue of storage. A true and correct copy of that letter is attached as Exhibit A.

4. I received no response from Slidell to my April 23, 2002 letter until Friday, August 2, 2002, when Slidell informed me through its counsel that it had unilaterally investigated warehouse space and planned to commit the equipment to storage on August 7, 2002, just five days later. A true and correct copy of that letter is attached as Exhibit B.

5. I responded to Slidell's counsel's August 2, 2002 letter in a letter dated August 7, 2002. In it, I indicated that Slidell had not provided Millennium with an opportunity to meet and confer on storage terms and that Millennium wished to reach an agreement with Slidell prior to any action Slidell might unilaterally take to place the equipment in storage. A true and correct copy of that letter is attached as Exhibit C.

6. On the same date, August 7, 2002, counsel for Slidell responded in writing to my earlier letter of that date. A true and correct copy of that letter is attached as Exhibit D.

7. On August 9, 2002, I again wrote to Slidell's counsel, reaffirming Millennium's willingness to reach an acceptable agreement with Slidell on the mechanics and costs of storing the partially-completed equipment. A true and correct copy of that letter is attached as Exhibit E.

8. After this latest exchange of letters, Paul Berwanger of Millennium traveled to Owatonna and, with Jim McGregor of Slidell, inspected several storage facilities in the Owatonna area. It was subsequently reported to me that Mr. McGregor and Mr. Berwanger mutually agreed upon an appropriate storage facility, and it was left to the attorneys for the parties to work out an overall agreement for the storage of the equipment, including the amount of and allocation of all storage-related costs.

9. On September 17, 2002, we received from counsel for Slidell a proposed stipulation regarding the storage of the equipment. In it, Slidell proposed that Millennium absorb 100% of all storage-related costs, including transportation of the equipment to the storage facility, the rental fee for the facility, and insurance costs. A true and correct copy of that stipulation and cover letter is attached as Exhibit F.

10. On September 19, 2002, we responded to Slidell's counsel's September 17, 2002 proposal. We categorically rejected Slidell's suggestion that Millennium absorb 100% of all storage-related costs, and instead proposed that all costs of transportation,

storage and insurance be shared equally by the parties on a 50/50 basis. A true and correct copy of our letter is attached as Exhibit G.

11. To my knowledge, we never received a written or other formal response from Slidell to Millennium's 50/50 cost sharing proposal. Our notes, records and recollections indicate that the storage issue essentially died out in the fall of 2002.

12. Slidell has taken the position in its moving papers that "Millennium refused to pay for the costs of storing the equipment." As shown by the foregoing, this representation is patently and demonstrably false. At all times, commencing with the issuance of the injunction, Millennium was willing to pay its fair share of the costs of transporting and storing the equipment, and it communicated that position repeatedly to Slidell. At the time the storage question ceased to be an active issue between the parties, Millennium was willing to pay 50% of all storage-related costs.

13. Throughout the three years this litigation was pending before trial, Millennium keenly desired that Slidell complete the packaging machines and deliver and install them at Millennium's facilities. Millennium's existing packaging equipment was outmoded, inefficient and unreliable, and Millennium had invested over $8.8 million in the new packaging machines without receiving delivery of a single item. In order to protect its investment in the packing machines and enhance the prospect that Millennium might someday acquire possession of them, in addition to its breach of contract claims Millennium asserted several equitable remedies against Slidell in its counterclaim.

14. Right up to the time of trial, Millennium reiterated its desire to obtain the packaging machines Slidell was building for it. During the Court-ordered settlement

discussions administered by the Magistrate Judge shortly before trial, Millennium's settlement position was premised upon the basis that Slidell would complete the machines and deliver them to Millennium. Though only Millennium's breach of contract, specific performance and replevin claims remained in the case at this point, Millennium intended to vigorously pursue all three at trial and take possession of the completed equipment if at all possible.

15. During the final settlement conference, however, Slidell made it abundantly clear that there was little if any hope that Slidell could ever complete the machines due to Slidell's loss of manpower and working capital, the volume of parts remaining to be purchased, Slidell's poor relationships with its suppliers, and other, similar factors. Millennium subsequently investigated these and other factors, such as those enumerated in Mr. McGregor's declaration, and reached the same conclusion stated by Mr. McGregor in his declaration – for a variety of reasons, the partially-completed packaging machines and parts would never be completed and possessed no reasonable value other than for scrap. Millennium's remaining equitable remedies of specific performance and replevin were now essentially meaningless. Rather than waste the Court's and jury's time by submitting meaningless claims for resolution, Millennium chose to voluntarily abandon those claims during trial, and it did so.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

s/ Scott A. Smith
Scott A. Smith

Subscribed and sworn to before me
this 5th day of May, 2005.

s/ Carol J. Wochnick
Notary Public

My Commission Expires 1-31-10